No. 85-46

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

_____

IN THE MATTER OF

J.B., Respondent/Appellant.

_____

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable William J. Speare, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Terry L. Seiffert, Billings, Montana

For Respondent:

Harold Hanser, County Attorney, Billings,
Montana
Hon. Mike Greely, Attorney General, Helena,
Montana

_____

Submitted on Briefs: May 3, 1985

Decided: September 10, 1985

Filed: SEP 10 1985

*Ethel M. Harrison*
_____
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

J. B. appeals an order of involuntary mental commitment in the Montana State Hospital at Warm Springs, Montana, entered in the District Court of the Thirteenth Judicial District, Yellowstone County, on December 31, 1984.

We affirm the order of involuntary commitment.

Appellant raises the following issues for our determination:

1. Whether there was sufficient credible evidence to support the conclusions that the respondent was seriously mentally ill.

2. Whether the respondent was properly detained under an emergency situation.

3. Whether the commitment herein was to the least restrictive environment.

For a long period of time J. B. had been a patient of psychiatrist Dr. Joseph D. Rich, M. D. Dr. Rich had admitted J. B. for psychiatric treatment to Deaconess Hospital in February 1982, March 1983, August 1983, April 1984, May 1984, and on December 20, 1984.

Police officers brought J. B. to Billings Deaconess Hospital on December 20, 1984, for driving his automobile around in circles in an open field, acting bizarre and talking of demons and odd religious topics.

Dr. Rich's report of December 26, 1984, states:

> [J. B.] is a 37-year-old divorced white male who was admitted to the Psychiatric Unit of the Billings Deaconess Hospital under my care on 12/20/84. The patient has a past history of multiple admissions to this hospital for very similar reasons, and my diagnosis has been that of a BIPOLAR AFFECTIVE DISORDER OF THE MANIC TYPE. Each admission has been precipitated because of his failure to

2

return to see me for proper medication management and because he has ceased taking his medications. This time is essentially the same.

I have met daily with [J. B.] and have been attempting to treat him with Lithium Carbonate, but this has been difficult because it is available in only an oral preparation; and he has been very resistant and very manipulative in trying to avoid taking this medication. I have had to maintain him on the locked unit of our Psychiatric facility, and he has continued to be very delusional and manic in his behaviors; and I have come close to having to place him in full restraints on a number of occasions.

Early this morning, I was contacted by the nurse on duty who was very concerned about his state of irritability and apparent distress and quoted him as saying, "I feel like killing anybody and anyone in sight". Extra medication was ordered, however this is an example of our concerns about his instability and his potential for harm to someone else.

My diagnosis continues to be that of a bipolar affective disorder, manic, of the chronic type with an acute exacerbation. I believe that [J. B.] is seriously mentally ill and that he is incapable at this point of caring for himself and appreciating the extent of his illness. I regard him as a potatential [sic] danger to himself and to others because of his emotional disturbance.

I believe that [J. B.] is in need of a longer term treatment program such as would be available at the Montana State Hospital at Warm Springs, Montana. I am recommending that he be committed there for treatment and transfer as soon as possible.

Petition for commitment was filed December 26, 1984, by the Yellowstone County Attorney alleging J. B. to be seriously mentally ill. On December 28, 1984, the District Court after hearing entered a statement of facts and order finding J. B. to be seriously mentally ill, beyond a reasonable doubt, and as defined in § 53-21-102(14), MCA, and committing

3

him to Montana State Hospital at Warm Springs, Montana, for treatment and evaluation for a period not to exceed three months.

At the December 28, 1984, hearing Dr. Rich testified:

Q. (By Mr. Brooks) Dr. Rich, now, you have examined [J. B.] recently; is that correct?

A. That's correct.

Q. And have you been able to determine whether or not [J. B.] is at this point suffering from a serious mental disease?

A. Yes, I believe he is. I've made the diagnosis of a bipolar affective disorder of the manic type, and it's currently referred to as a manic depressive disorder.

Q. And with [J. B.], how has this type of mental illness been manifested?

A. Well, this time it was very similar to other times. He becomes excessively religious. He begins to feel there are people out there attempting to harm him. He begins to do things that really afterwards cause him a great deal of embarrassment in the community. He does very erratic kinds of things. He talks of having to kill. He becomes excessively and overtly sexual.

. . .

Q. Now, recently based on your diagnosis, do you think at this time that [J. B.] is able to protect himself as far as his health and as far as his welfare is concerned in his present living situation?

A. No, I really do not, and I could give some examples for that. First of all, I've spent hours discussing with him how medication really helps his illness, and I've had these discussions when he's healthy, and yet he refuses to take the medication to maintain himself out of the hospital.

Now that he's in the hospital, this medication can only be given orally. It cannot be given in a shot form, and he's done everything he can to avoid talking [sic] the medication, and he's beating

4

us at the game, and they are going down even though I've been increasing the dose.

. . .

I talked to one of our nurses the other evening. She said "How can I handle this, because he feels an overwhelming urge to kill." I gave her some orders about not being with him without a man in attendance, so I feel that this illness is very devastating to him and potentially is a danger to others.

Q. From what you've said, I take it the major problem at this point is the fact that you cannot control and supervise his medication?

A. That's right. This particular medication is not available as a shot, so he does get better with treatment, and there is a possibility for him to maintain himself out of the hospital, but he has to work along with a psychiatrist to take the medication on a regular basis, to get blood tests on a regular basis, and he has failed to do that over and over again.

Without objection Dr. Rich's report of December 26, 1984, was admitted in evidence.

J. B. testified as follows:

Q. Have you made threats of injury to anybody?

A. Yes.

Q. And was that what the doctor testified to?

A. Yes.

I

Was there sufficient credible evidence to support the finding that J. B. was seriously mentally ill?

We conclude that there was sufficient credible evidence to support the District Court findings.

The definition of "mental disorder" is stated in § 53-21-102(5), MCA:

> "Mental disorder" means any organic, mental, or emotional impairment which has substantial adverse effects on an individual's cognitive or volitional functions.

The definition of "seriously mentally ill" is stated in § 53-21-102(14), MCA:

> "Seriously mentally ill" means suffering from a mental disorder which has resulted in self-inflicted injury or injury to others or the imminent threat thereof or which has deprived the person afflicted of the ability to protect his life or health. For this purpose, injury means physical injury. No person may be involuntarily committed to a mental health facility or detained for evaluation and treatment because he is an epileptic, mentally deficient, mentally retarded, senile, or suffering from a mental disorder unless the condition causes him to be seriously mentally ill within the meaning of this part.

The standard of proof required is stated in § 53-21-126(2), MCA:

> The standard of proof in any hearing held pursuant to this section is proof beyond a reasonable doubt with respect to any physical facts or evidence and clear and convincing evidence as to all other matters, except that mental disorders shall be evidenced to a reasonable medical certainty. Imminent threat of self-inflicted injury or injury to others shall be evidenced by overt acts, sufficiently recent in time, as to be material and relevant as to the respondent's present condition.

The previously quoted facts from the record establish proof beyond a reasonable doubt as to J. B. having been seriously mentally ill at the time of his commitment.

Dr. Rich's report of December 28, 1984, established that J. B. suffered from a mental disorder, bipolar affective disorder of the manic type, a manic depressive disorder. His

6

testimony from the transcript shows that he had admitted J. B. to the hospital six times since February 1982, almost every admission because J. B. refused to take his medication.

Dr. Rich's report and testimony established that J. B. had stated, "I feel like killing anybody and anyone in sight." J. B. testified that he had made threats and that was what the doctor was talking about.

In the Matter of the Mental Health of Goedert (1979), 180 Mont. 484, 487, 591 P.2d 222, 224, this Court stated:

> While not every threat can be considered an overt act, the testimony and circumstances of this case indicate that appellant's threats fulfilled the statutory requirement of an overt act. A threat to kill is a verbal act that falls within the definition of an "overt act" as set forth in the statute.

"The threat to kill another is a verbal overt act. It manifests the commission of a dangerous act upon . . . another." In the Matter of F. B. (Mont. 1980), 615 P.2d 867, 869, 37 St.Rep. 1442, 1445. J. B. expressed with agitation, "I feel like killing anybody and anyone in sight." This statement is a verbal act that falls within the definition of an "overt act" as set forth in the statute.

> When there is proof beyond a reasonable doubt that there is a present indication of probable physical injury likely to occur at any moment or in the immediate future, coupled with the finding within a reasonable medical certainty that the individual is suffering from a mental disorder, then involuntary civil commitment . . . is required.

F. B., 615 P.2d at 870.

Our citizens are entitled to protection from harm at the hands of those unfortunate persons who are victims of a mental disorder. Most certainly the legislature never intended that blood of innocent people must first be shed

7

before the statutory definition of "overt act" has been satisfied.

Most of J. B.'s commitments ordered by Dr. Rich were related to his failure to follow prescribed medication and medical advice in monitoring his condition while he was in an outpatient status. This failure, in the facts presented here, has deprived J. B. of the ability to protect his health and also meets the test of the statutory definition of "seriously mentally ill." Section 53-21-102(14), MCA; In the Matter of C. M. (1981), 195 Mont. 171, 635 P.2d 273.

The core purpose of our statutory scheme in addressing those unfortunate persons who suffer a mental disorder is to secure for them such care and treatment, skillfully and humanely administered, as may be in their best interest. This purpose is codified in § 53-21-101(1), MCA.

II

Whether the respondent was properly detained under an emergency situation.

From the discussion of the first issue we conclude that J. B. was properly detained under the emergency provisions of § 53-21-129, MCA. J. B.'s five prior admissions to Billings Deaconess Hospital and the recent events leading to his admission of December 20, 1984, establish in the record that the requirements of the statute have been substantially satisfied.

III

Whether the commitment herein was to the least restrictive environment.

The District Court found:

8

4. In regard to treatment alternatives available, Dr. Rich testified that out-patient supervision, or a similar local course of treatment would not be appropriate nor helpful in improving respondent's condition at this time, primarily due to the inability of respondent to cooperate in taking his medication as prescribed; that respondent is, for the immediate future, in need of longer term, in-patient treatment at the Montana State Hospital in Warm Springs and that this is the least restrictive environment for respondent at this time.

The District Court's finding is based upon substantial credible evidence and will not be disturbed.

The findings and order of the District Court are affirmed.

Chief Justice

We concur:

Justices

9

Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent.

Section 53-21-102(14), MCA, provides in part as follows:

> No person may be involuntarily committed
> to a mental health facility or detained
> for evaluation and treatment because he
> is . . . suffering from a mental disorder
> unless the condition causes him to be
> seriously mentally ill within the meaning
> of this part.

The State must prove physical facts beyond a reasonable doubt and all other matters by clear and convincing evidence. To prove imminent threat of injury requires a showing of overt acts, recent enough to be relevant to the present condition. Section 53-21-126(2), MCA.

I find this record to be devoid of any substantial credible evidence to support a finding of "overt acts." A fair summary of the evidence against J.B. is the following: (1) He masturbated during his last hospitalization. (2) He reached out and touched female staff on the "breast or on the rear." (3) A report to a nurse that he had feelings of urges to kill which were described as, not so much a threat of violence, but J.B.'s feelings. (4) At the time J.B. was apprehended he was driving an automobile around in circles in an open field and when stopped spouted "religious ideation."

Dr. Rich gave an expert opinion in addition to the proof outlined above. The doctor stated: "I feel that this illness is very devastating to him and potentially is a danger to others."

The summary of evidence against J.B. shows him to be bizarre. More should be required for commitment. This case sets a dangerous precedent for incarceration of those deemed to be different.

The courts should be vigilant in protecting the rights of those sought to be committed. The discharge of judicial

responsibility includes rigorous application of the statutory mandate. The State has failed to prove that J.B. took overt acts to create a present danger to either himself or others. The failure of such proof should require reversal of the involuntary commitment.

_____
Justice

11