No. 00-144

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 140

IN THE MATTER OF

THE MENTAL HEALTH OF K.G.F.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Allen Smith, Jr., Helena, Montana

For Respondent:

Joseph P. Mazurek, Montana Attorney General, Tammy K. Plubell, Assistant Montana Attorney General, Helena, Montana; Mike McGrath, Lewis and Clark County Attorney, Michael Menahan, Deputy Lewis and Clark County Attorney, Helena, Montana

Submitted on Briefs: November 9, 2000
Decided: August 2, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 K.G.F[1]. appeals the order entered by the First Judicial District Court, Lewis and Clark County, that involuntarily committed her to a mental health facility. K.G.F. contends that she was denied effective assistance of counsel during the course of the commitment proceedings.

¶2 We reverse and remand for further proceedings.

¶3 K.G.F. raises the following issue:

Did her counsel render ineffective assistance of counsel in violation of her rights guaranteed under the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 It is undisputed that the condition of K.G.F.'s mental health in October of 1999, reached a critical point that led her to voluntarily seek treatment at St. Peter's Community Hospital in Helena, Montana. She was admitted into the hospital on October 21, 1999.

¶5 K.G.F. is afflicted with bipolar disorder or what is oftentimes referred to as manic-depressive illness. The disorder is a biochemical imbalance that causes gross mood changes from the high reaches of mania to the lows of severe depression. K.G.F.'s disorder has been diagnosed as "mixed rapid cycling." The term "mixed" identifies a particular kind of bipolar episode that features both mania and depression. The term "rapid cycling" generally refers to frequent severe episodes of depression and mania.

¶6 Up until her hospitalization, K.G.F. controlled her disorder with medication and was under psychiatric care. At the time she entered the hospital, K.G.F. had apparently "fired" her treating psychiatrist and was suicidal, which is not an uncommon symptom of a person afflicted with her kind and degree of bipolar disorder. She has a medical history of prior hospitalizations and episodes of suicidal behavior. Testimony herein indicates that K.G.F. did not take any affirmative steps in attempting suicide beyond threatening to do so while voluntarily committed at the hospital. Although not entirely clear, hearing testimony as well as a medical "professional person's" report indicate that there were actual suicide attempts in the past, one as recent as June of 1999.

¶7 After her admission, K.G.F. disagreed with the medications prescribed for her and refused to take those medications. It is undisputed that she is intelligent, and quite adept at understanding the medications she takes in relation to managing her disorder. Against medical advice, she requested that she be released from the hospital. By the time of her commitment hearing, however, she was apparently willing to take her medication and apparently willing to undergo further voluntary commitment if necessary.

¶8 On October 26, 1999, a deputy county attorney filed a petition with the District Court "alleging mental disorder that requires commitment." The petition relied on the findings and request made by a case coordinator, Nancy McVean, at St. Peter's who was also a certified "professional person" under § 53-21-106, MCA. The primary focus and concern was that K.G.F. planned to commit suicide, and that once released from the hospital she would implement her plan. The petition also reported that K.G.F. was indigent and therefore unable to afford an attorney, and that she was "presently detained" at the hospital. The petition requested that K.G.F. be held at the hospital for further evaluation and treatment until a commitment hearing took place.

¶9 That same day, the District Court issued an order finding probable cause that K.G.F. had a mental disorder requiring commitment. Counsel was appointed pursuant to this order. An initial appearance took place later that same day some time in the afternoon, according to a court reporter minute entry. At that time, with counsel present, K.G.F.'s constitutional rights were explained to her as well as the substantive effects of the petition. A hearing was set for the next morning, on October 27, 1999, at 11:30 a.m.

¶10 Two medical professionals were called to testify at the hearing the next day, one by the State and one by counsel for K.G.F. Both experts had interviewed K.G.F. and reviewed her records. K.G.F. was also called to testify. Although present at the hearing, K.G.F.'s husband was not called to testify.

¶11 McVean, the case coordinator who had requested the petition and who in turn served as a "professional person" as required by law, recommended that based on her interview with K.G.F., K.G.F. should be committed to a community facility, as opposed to the State Hospital at Warm Springs.

¶12 Nancy Adams, who had spent approximately one hour with K.G.F. the day before, recommended that K.G.F. remain in the hospital for a few days, so that a community-based treatment plan in Bozeman--nearer to where K.G.F. lived--could be arranged. She

testified that "being pulled away from her closest support, her husband, and staying in a strange place might do more harm than good."

¶13 K.G.F. was called to testify on her own behalf. She agreed that the Bozeman option would be best for her, and explained that she had private financial and insurance resources to cover the expenses. She further testified that "my husband is there and he is with me every night and every morning." She indicated that she would voluntarily remain at the St. Peter's facility until such arrangements could be worked out.

¶14 The court issued its findings of fact, conclusions of law, and order that day following the hearing. The court then issued an amended findings of fact, conclusions of law, and order on November 2, 1999. The latter struck one finding, and was otherwise identical to the prior order.

¶15 The court found that K.G.F., while at St. Peter's Hospital, "began to refuse medications and desired to sign out against medical advice." Upon finding that K.G.F. suffered from bipolar disorder "mixed" and that she was an "imminent threat of injury to herself," the court ordered that she be committed to Golden Triangle Mental Health, in Helena, for a period of 90 days for "care, treatment and evaluation of the respondent's mental health needs . . ."

¶16 K.G.F. appeals the findings of fact, conclusions of law, and order on the grounds she received ineffective assistance of counsel at the hearing.

## STANDARD OF REVIEW

¶17 Our review of the constitutional issues of due process and right to counsel involves questions of law and our review of such questions is plenary. *See Pickens v. Shelton-Thompson*, 2000 MT 131, ¶¶ 7-8, 300 Mont. 16, ¶¶ 7-8, 3 P.3d 603, ¶¶ 7-8; *State v. Okland* (1997), 283 Mont. 10, 14, 941 P.2d 431, 433.

## DISCUSSION

¶18 As a preliminary matter, we agree with K.G.F.'s contention that this controversy is not moot, even though K.G.F. is no longer subject to the 90-day commitment order. Although the issue of mootness was not contested by the State, we nevertheless emphasize that the issue was resolved by this Court some time ago, in *In re N.B.* (1980), 190 Mont. 319, 620

P.2d 1228 (superseded in part by statute as stated in *In re J.M.* (1985), 217 Mont. 300, 304-05, 704 P.2d 1037, 1040).

¶19 Our reasoning there, as here, was that this Court "reserves to itself the power to examine constitutional issues that involve the broad public concerns to avoid future litigation on a point of law." *In re N.B.*, 190 Mont. at 322-23, 620 P.2d at 1230-31 (concluding important constitutional questions were not rendered moot by patient's release from Warm Springs mental health facility and observing that approximately 100 Montanans each year are involuntarily committed for three months of treatment and evaluation in that facility).

¶20 Thus, we conclude that the claimed constitutional right to effective assistance of counsel in civil involuntary commitment proceedings is "capable of repetition, yet evading review." *Heisler v. Hines Motor Co.* (1997), 282 Mont. 270, 275-76, 937 P.2d 45, 48 (setting forth mootness standard). Accordingly, we proceed to the issue raised.

## ISSUE PRESENTED

*Did K.G.F.'s counsel render ineffective assistance of counsel in violation of her rights guaranteed under the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution?*

¶21 K.G.F. argues that although she was appointed counsel by the District Court, her constitutional right to effective assistance of counsel was denied during the course of her involuntary commitment proceedings.

¶22 K.G.F. reasons that this claimed right exists because the involuntary civil commitment process may deprive an individual of his or her liberty, and therefore should be likened to criminal custody and incarceration. She contends, therefore, that her constitutional right to effective assistance of counsel flows from both the Sixth Amendment to the U.S. Constitution and Article II, Section 24, of the Montana Constitution, and must be scrutinized pursuant to this Court's application of the *Strickland* test.

¶23 The State and Amicus[2] contend that the foregoing constitutional protections afforded individuals in criminal proceedings are not appropriate for the "unique legal undertaking" of a civil commitment proceeding. K.G.F., as an alternative position, concurs with this due process argument.

¶24 Although clearly not agreeing as to what should constitute a standard of "effectiveness," K.G.F., the State, and Amicus urge this Court to turn to the foundation of the due process clause under either the federal or our state constitution, and construct an appropriate standard for ensuring the "fundamental fairness" of civil commitment proceedings. *See In re W.M.* (1992), 252 Mont. 225, 229, 828 P.2d 378, 381 (stating that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection, and citing *Addington v. Texas* (1979), 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 330-31); *In re Shennum* (1984), 210 Mont. 442, 450-51, 684 P.2d 1073, 1078 (stating that procedural safeguards in commitment cases were "inserted by the Legislature because of the calamitous effect of a commitment: a deprivation of a person's liberty for up to three months . . . and the inevitable damage to a person's reputation"). *See also Foucha v. Louisiana* (1992), 504 U.S. 71, 80, 112 S.Ct. 1780, 1785 (stating that freedom from bodily restraint has always been at the core of the liberty protected by the due process clause from arbitrary governmental action); *Mathews v. Eldridge* (1976), 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (stating that due process is "flexible and calls for such procedural protections as the particular situation demands").

¶25 This Court has not previously addressed whether a person subjected to an involuntary commitment proceeding has a constitutional right to effective assistance of counsel, and, if so, how such effectiveness should be measured.[3]

## A. The right to effective assistance of counsel

¶26 Involuntary civil commitments in Montana are governed by Title 53, Chapter 21, MCA (codified in 1975). Our initial review of this matter is guided by § 53-21-101(4), MCA, which expressly provides that one purpose of our laws governing the treatment of "seriously mentally ill" persons is to "ensure that due process of law is accorded any person coming under the provisions of this part." Further, under § 53-21-115, MCA, a person who is involuntarily detained or against whom a commitment petition is filed is expressly afforded numerous due process rights including the right to be represented by counsel. *See* § 53-21-115(5), MCA; § 53-21-116, MCA (judge shall appoint attorney if person has no attorney).[4] *See also* § 53-21-119(1), MCA (right to counsel may not be waived).

¶27 In turn, the foregoing statutory rights explicitly and implicitly garner protection under

both the federal and the Montana constitutions. We disagree with K.G.F., however, that the protection of those rights flows from the express constitutional provisions addressing persons subject to criminal prosecution.

¶28 The Sixth Amendment to the U.S. Constitution provides that in all *criminal* prosecutions, the accused shall have the assistance of counsel. Similarly, under Article II, Section 24, of the Montana Constitution, the accused in all "criminal prosecutions" shall have the right to appear and defend in person and by counsel. Where a criminal defendant claims his or her constitutional right to effective counsel has been violated, this Court applies the two-part *Strickland* test, derived from the U.S. Supreme Court decision in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *See*, *e.g.*, *State v. Berg*, 1999 MT 282, ¶ 28, 296 Mont. 546, ¶ 28, 991 P.2d 428, ¶ 28 (identifying two-prong *Strickland* ineffective assistance of counsel test as (1) whether counsel acted within the range of competence demanded of attorneys in criminal cases and (2) whether counsel's deficient performance prejudiced the defense so as to deny the defendant a fair trial).

¶29 As argued by K.G.F., at least one other state appellate court has adopted and applied *Strickland* to the involuntary civil commitment process in order to secure an individual's rights to due process. *See In re Carmody* (Ill.App.Ct. 1995), 653 N.E.2d 977.

¶30 We agree with the *Carmody* court to the extent it reasoned that where a state statute affords an individual subject to involuntary commitment with the right to counsel, the legislature could not have intended that counsel could be prejudicially ineffective. *See Carmody*, 653 N.E.2d at 983 (holding that the State's statutorily providing a respondent in an involuntary commitment proceeding with the right to counsel implicitly includes the right to the effective assistance of that counsel, and citing to *Strickland*). *See also In re Commitment of Hutchinson* (Penn. 1982), 454 A.2d 1008, 1011 (holding that an alleged mental incompetent is entitled to effective representation by competent counsel).

¶31 Therefore, we hold that the right to counsel, as provided under our Title 53, Chapter 21 statutes, provides an individual subject to an involuntary commitment proceeding the right to effective assistance of counsel. In turn, this right affords the individual with the right to raise the allegation of ineffective assistance of counsel in challenging a commitment order.

¶32 The fundamental question that must be resolved, as addressed by the parties and

Amicus, is *how* effective counsel must be when representing an individual who is facing an involuntary commitment.

## B. The Strickland standard is an inappropriate threshold

¶33 Although in numerous respects the procedural due process rights of an involuntary commitment patient-respondent are identical to those afforded an accused criminal defendant, we disagree with K.G.F. and the *Carmody* court that the application of the *Strickland* standard is appropriate in involuntary civil commitment proceedings. We conclude that the standard under *Strickland* simply does not go far enough to protect the liberty interests of individuals such as K.G.F., who may or may not have broken any law, but who, upon the expiration of a 90-day commitment, must indefinitely bear the badge of inferiority of a once "involuntarily committed" person with a proven mental disorder.[(5)]

¶34 The *Strickland* decision, for example, provides that a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (citation and internal quotations omitted). *See also State v. Hanson* (1997), 283 Mont. 316, 327, 940 P.2d 1166, 1173 (quoting from *Strickland*, and observing U.S. Supreme Court's warning that courts should be "highly deferential" when second guessing counsel's assistance).

¶35 Even a cursory review of legal commentary reveals the flawed reasoning of applying the foregoing *Strickland* standard to involuntary civil commitment proceedings. Namely, "reasonable professional assistance" cannot be presumed in a proceeding that routinely accepts--and even requires--an unreasonably low standard of legal assistance and generally disdains zealous, adversarial confrontation. *See generally* Michael L. Perlin, *Fatal Assumption: A Critical Evaluation of the Role of Counsel in Mental Disability Cases*, 16 Law & Hum. Behav. 39, 53-54 (1992) (identifying *Strickland* standard as "sterile and perfunctory" where "reasonably effective assistance" is objectively measured by the "prevailing professional norms") (hereinafter *Perlin*).

¶36 Further, we disagree with the *Carmody* court's *Strickland* analysis indicating that in involuntary commitment proceedings "no issues are likely to arise regarding respondent's counsel's failure to adequately investigate or prepare for trial, or counsel's failure to pursue defenses or witnesses as suggested by his client." *See Carmody*, 653 N.E.2d at 984-85. To

the contrary, the conduct of counsel during those few available hours prior to an involuntary commitment hearing or trial should be a key focal point of the inquiry as to whether the counsel's representation was effective.

¶37 To this extent we disagree with K.G.F. that the "most startling evidence that counsel's deficient performance prejudiced [K.G.F.] was counsel's failure to object to hearsay testimony." The weight of one missed objection to questionable testimony at a hearing is minuscule in comparison to the failure to fully investigate and comprehend a patient's circumstances prior to an involuntary civil commitment hearing or trial, which may, in turn, lead to critical decision-making between counsel and client as to how best to proceed. Such pre-hearing matters, which shall be discussed *infra*, clearly involve effective preparation prior to a hearing or trial.

¶38 We also agree with Amicus that the *Strickland* burden of proving that counsel's "deficient performance prejudiced the defense so as to deny the defendant a fair trial," is contrary to our prior case law that mandates that unless civil commitment laws are strictly followed, a commitment order must be reversed. *See*, *e.g.*, *In re Morlock* (1993), 261 Mont. 499, 501, 862 P.2d 415, 416 (citations omitted). This argument is also raised by K. G.F., in alternatively arguing that a non-*Strickland* due process analysis would find counsel ineffective here as well.

¶39 Finally, we agree with the State and Amicus that the 6th Amendment to the U.S. Constitution, and Article II, Section 24, pertain to criminal proceedings alone, and that although affording an individual with certain "criminal" due process rights, the involuntary commitment process does not invoke those constitutional provisions. *See* § 53-21-115(6), MCA (person has the right to remain silent) *and compare with* § 53-21-115(7), MCA (hearing governed by rules of evidence applicable to civil matters); § 53-21-126(3), MCA (proceedings governed by Montana Rules of Civil Procedure). *See also* § 53-21-126 (2), MCA (providing hybrid standards of proof at civil commitment trials or hearings: "beyond a reasonable doubt" and "clear and convincing evidence").

¶40 Thus, we turn as suggested by the State and Amicus, to the due process clause of the Montana Constitution.

## C. Due process and fundamental rights

¶41 Under Article II, Section 17, the Montana Constitution provides that "No person shall

be deprived of life, liberty, or property without due process of law."

¶42 As a starting point, it is safe to say that in purportedly protecting the due process rights of an individual subject to an involuntary commitment proceeding--whereby counsel typically has less than 24 hours to prepare for a hearing on a State petition that seeks to sever or infringe upon the individual's relations with family, friends, physicians, and employment for three months or longer[6]--our legal system of judges, lawyers, and clinicians has seemingly lost its way in vigilantly protecting the fundamental rights of such individuals. *See In re Mental Health of L.C.B.* (1992), 253 Mont. 1, 7, 830 P.2d 1299, 1303 (stating that courts must safeguard the due process rights of the individual involved at every stage of the proceedings); *In re J.B.* (1985), 217 Mont. 504, 511, 705 P.2d 598, 603 (stating that the discharge of judicial responsibility includes rigorous application of statutory mandates) (Morrison, J., dissenting).

¶43 In the case *sub judice*, for example, the public defender appointed to represent K.G.F. had, from the close of the initial appearance to the commencement of the commitment hearing, at best four or five working hours--amidst his usual case load of criminal matters--to prepare for what can only be described as a perfunctory process that lasted minutes.

¶44 Our Legislature has, however, expressly provided that an individual who may be suffering from a mental disorder and who, as a result, may be involuntarily committed must be afforded care and treatment that fully respects that person's "dignity and personal integrity." *See* § 53-21-101(1), MCA. Once admitted to a mental health facility, whether voluntarily or involuntarily, a patient has the right to "privacy and dignity," under § 53-21-142(1), MCA. These legislative mandates, in turn, invoke fundamental rights under our state constitution.

¶45 Respect for a person's dignity invokes Article II, Section 4, under this state's constitution, which provides that "dignity of the human being is inviolable." *See Armstrong v. State*, 1999 MT 261, ¶ 72, 296 Mont. 361, ¶ 72, 989 P.2d 364, ¶ 72 (stating that "[r]espect for the dignity of each individual--a fundamental right, protected by Article II, Section 4 of the Montana Constitution--demands that people have for themselves the moral right and moral responsibility to confront the most fundamental questions about the meaning and value of their own lives and the intrinsic value of life in general, answering to their own consciences and convictions").

¶46 One example of respect for a patient-respondent's dignity, as provided by the

Legislature under Title 53, Chapter 21, is the requirement that the person has a right "to be dressed in the person's own clothes at any hearing held pursuant to this part." *See* § 53-21-115(10), MCA. Implicit under Title 53, Chapter 21, is also the notion that the hearing shall be conducted in court, not in a mental health facility, which enhances the dignity afforded to the individual. *See* §§ 53-21-115(2) and 116, MCA (respondent has the right to be present in any hearing or trial); § 53-21-119(2), MCA (affording respondent the right to waive presence at hearing and indicating an "alternative location" for a hearing in "surroundings familiar to the respondent" may be appropriate).[(7)]

¶47 In *Armstrong*, this Court identified an individual's medical decisions affecting "bodily integrity" as a fundamental right under the personal autonomy component of the constitutional right to privacy set out in Article II, Section 10, of the Montana Constitution. *See Armstrong*, ¶ 39. Respect for a patient-respondent's medical-decision personal autonomy has likewise been expressed by our Legislature under § 53-21-115(11) and (12), MCA, which provide that a person has the right to either refuse or voluntarily take medications prior to any hearing, and the right to be examined by a professional person of the respondent's choice, under §§ 53-21-115(9) and 53-21-124(3), MCA.

¶48 That these fundamental constitutional rights are at issue during all phases of the involuntary commitment process, including prior to a hearing when counsel is either appointed or obtained, is self evident. Thus, we agree that the "[q]uality counsel provides the most likely way--perhaps the *only* likely way" to ensure the due process protection of dignity and privacy interests in cases such as the one at bar. *See Perlin*, at 47.

¶49 Therefore, in reviewing the procedural circumstances set forth here for whether K.G. F. was afforded effective assistance of counsel, we must address the obvious systemic failure of the involuntary civil commitment hearing process itself. In doing so, we emphasize that what follows is not meant as a *per se* indictment of the individual counsel here or appointed counsel in these matters in general; nor is it a tacit censure of the individual professionals involved, who undoubtedly have sound therapeutic objectives in mind. Rather, our aim is on the failure of the system as a whole, one that through the ordinary course of the efficient administration of a legal process threatens to supplant an individual's due process rights that serve to safeguard the fundamental liberty interests discussed thus far.

¶50 Accordingly, while we may draw from the collective jurisprudence of both federal and other state's decisions and statutes, as well as an array of thoughtful commentary by

scholars and practitioners, we must nevertheless articulate a guiding standard that comports with Montana's unique constitutional and statutory framework, one that protects the fundamental rights of individuals whose liberty is placed at issue by State action.

## D. Individual liberty and the parens patriae doctrine

¶51 In articulating a standard for effective counsel, it is necessary to recognize and dispel certain stereotypes that serve only to frustrate the legal process that purports to secure the skillful and humane care and treatment of individuals suffering from mental disorders.

¶52 In this regard, our citation to the California Supreme Court's decision, *Conservatorship of Roulet* (Cal. 1979), 590 P.2d 1, in *In re Shennum* (1984), 210 Mont. 442, 451, 684 P.2d 1073, 1078, is significant. In *Shennum*, we voiced the same concerns addressed by the California court in its landmark decision. *See In re Shennum*, 210 Mont. at 450-51, 684 P.2d at 1078 (stating that the *Roulet* court "nailed it down" in addressing the detrimental deprivation of a person's liberty and the inevitable damage to a person's reputation that may result from a civil commitment).

¶53 Although decided more than 20 years ago, the *Roulet* court's recognition that society "views the mentally ill with suspicion" is still relevant today. *See Roulet*, 590 P.2d at 6. Due to the potentially "socially debilitating" stigma that results from the "irrational fear of the mentally ill," the court posited that "[i]t is implausible that a person labeled by the state as so totally ill could go about, after his release, seeking employment, applying to schools, or meeting old acquaintances with his reputation fully intact." *Roulet*, 590 P.2d at 7. Thus, the "former mental patient is likely to be treated with distrust and even loathing; he may be socially ostracized and victimized by employment and educational discrimination . . . the experience may cause him to lose self-confidence and self-esteem." *Roulet*, 590 P.2d at 7.

¶54 Our review of current literature concerning the treatment of the mentally ill as presented by Amicus leads us to once again agree with the California court that "[i]n the ideal society, the mentally ill would be the subjects of understanding and compassion rather than ignorance and aversion . . . . [b]ut that enlightened view, unfortunately, does not yet prevail." *Roulet*, 590 P.2d at 6.

¶55 Nevertheless, as suggested by Amicus, we are mindful that such ideals as understanding and compassion are expressed in the Montana Constitution's Declaration of

Rights, as well as under Title 53, Chapter 21, as discussed thus far. *See*, *e.g.*, Matthew O. Clifford & Thomas P. Huff, *Some Thoughts on the Meaning and Scope of the Montana Constitution's "Dignity" Clause with Possible Applications*, 61 Mont.L.Rev. 301, 330-32 (2000) (discussing application of the dignity clause to treatment of persons under State supervision: "[i]t is natural to speak of the inherent dignity of such . . . mentally ill persons, and to speak of the requirements that such vulnerable persons be treated with dignity"); *Armstrong*, ¶ 39 (discussing the right of each individual to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from the interference of the government).

¶56 Amicus addresses this very point in contending that because the fundamental rights attached to decisions within the "provider-patient relationship" may be overridden by the State's *parens patriae* duties and police power authority, the role of counsel is all the more critical where a patient may be involuntarily committed. The threats to individual liberty posed by involuntary commitment, according to Amicus, arise at a time "when the individual with a mental illness is least able to defend against them--during a time of crisis, confusion, fatigue." *See also* Bruce J. Winick, *Therapeutic Jurisprudence and the Civil Commitment Hearing*, 10 J. Contem. Legal Issues 37, 44-45 (1999) (observing that "[p]erhaps nothing can threaten a person's belief that he or she is an equal member of society as much as being subjected to a civil commitment hearing" and when "legal proceedings do not treat people with dignity, they feel devalued as members of society") (hereinafter *Winick*).

¶57 We therefore question the State's contentions regarding how much process is due to K. G.F. with regard to effective counsel.

¶58 According to the State, this Court should keep its sights clearly focussed on the balance between the State's duties under the *parens patriae* doctrine--i.e., the "humanitarian" or benevolent obligation to protect those citizens unable to protect themselves--and the exercise of police power to protect the general public health, safety, welfare and morals from the "imminent threat" of injury from persons afflicted by mental disorders. *See In re Sonsteng* (1977), 175 Mont. 307, 314, 573 P.2d 1149, 1153-54. *See also In re J.B.* (1985), 217 Mont. 504, 509-10, 705 P.2d 598, 602 (stating that "the legislature never intended that blood of innocent people must first be shed before the statutory definition of 'overt act' has been satisfied").

¶59 The *Sonsteng* decision cited by the State in this regard is particularly instructive. In

spite of scientific and social advances in our understanding and treatment of individuals with mental disorders in recent years--as expressed by the policy set forth under § 53-21-101, MCA--the Court in *Sonsteng* gave voice to the all-too-familiar common law notion that the State, in its sovereign role as "father of the country," retains the authority to "act as the general guardian of all . . . idiots and lunatics." *In re Sonsteng*, 175 Mont. at 314, 573 P.2d at 1153 (citing and quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257, 92 S. Ct. 885, 888, 31 L.Ed.2d 184 (1972)).

¶60 The use of such stereotypical labels--which, as numerous commentators point out, helps create and reinforce an inferior second-class of citizens--is emblematic of the benign prejudice individuals with mental illnesses face, and which are, we conclude, repugnant to our state constitution.[8] *See generally* Michael L. Perlin, *On "Sanism,"* 46 SMU L. Rev. 373, 374 (1992) (identifying prejudice toward the mentally ill among "well-meaning citizens" as the same "quality and character of other prevailing prejudices such as racism, sexism, heterosexism and ethnic bigotry," which in turn is reflected in our legal system); *Winick*, at 45 (stating that because people with a mental illness "already have been marginalized and stigmatized by a variety of social mechanisms, self-respect and their sense of their value as members of society are of special importance to them" throughout legal proceedings).

¶61 Nevertheless, our concept of due process regarding state action involuntarily imposed on individuals with mental disorders has surely progressed since the U.S. Supreme Court's decision in *Buck v. Bell*. In that case, Justice Holmes described a "feeble-minded white woman," who was the daughter of a "feeble-minded mother" and the mother of an "illegitimate feeble-minded child." The Court declared that the woman, who was committed to the "State Colony for Epileptics and Feeble Minded," could be involuntarily sterilized in the "best interest of the patients and of society" because:

> It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind . . . . Three generations of imbeciles are enough.

*Buck v. Bell* (1927), 274 U.S. 200, 205-207, 47 S.Ct. 584, 584-85, 71 L.Ed. 1000 (Holmes, J.).[9]

¶62 However enlightened we, as a society, may have become in the intervening 75 years since *Buck v. Bell*, we must nevertheless be cautious and critical of signs of paternalism

legitimized by the *parens patriae* doctrine, where State actors purport to have an absolute understanding of what is in the best interests of an individual, whose liberty, dignity and privacy are at issue, and whose voice is muted by the swift and overriding authority of court-appointed professionals. *See generally In re J.B*, 217 Mont. at 511, 705 P.2d at 603 (stating that although the evidence against J.B. proved him to be "bizarre," the decision of the majority "sets a dangerous precedent for incarceration of those deemed to be different") (Morrison, J., dissenting). As Justice Brandeis cautioned in *Olmstead v. United States*, "[e]xperience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent." *Olmstead v. United States* (1928), 277 U.S. 438, 479, 48 S.Ct. 564, 572-73, 72 L.Ed. 944 (Brandeis, J., dissenting). *See also Roulet*, 590 P.2d at 9 (stating that "[i]t would be small solace to a person wrongly judged mentally incompetent that his road to commitment was paved with good intentions").

¶63 We must recognize, after all, that an involuntary commitment is supposed to *help*, not *punish*, the person who "may be suffering from a mental disorder." *See* § 53-21-101, MCA. *See also Addington v. Texas* (1979), 441 U.S. 418, 428, 99 S.Ct. 1804, 1810, 60 L. Ed.2d 323 (providing that a state's power in a civil commitment proceeding, as opposed to a criminal prosecution, is not exercised in a punitive sense). As discussed by numerous scholars, the legislated involuntary commitment process must, as a matter of public policy, strive to maintain the "therapeutic influence" of the legal system on the individual. *See generally Winick*, at 52-60 (discussing the need to "reconceptualize" the attorney-client relationship in civil commitment proceedings to "augment the potential therapeutic effects"). However, as argued by Amicus, rather than helping the individual afflicted with a mental disorder, the legal system's paternalistic influence too often turns such individuals away from seeking treatment due to the imminent fear of involuntary commitment. *See* National Institute for Mental Health, U.S. Department of Health and Human Services, *Mental Health: A Report of the Surgeon General*, at 457 (1999) (stating that "[o]ne point is clear: the need for coercion should be reduced significantly when adequate services are readily accessible to individuals with severe mental disorders who pose a threat of danger to themselves or others" and that "coercion should not be a substitute for effective care that is sought voluntarily").

¶64 Thus, with the foregoing in mind, it is imperative that we construct a constitutionally sound framework detailing the deliberate steps counsel should take to effectively protect his or her client's best interests--in particular the liberty interests addressed herein--and ensure that the client receives a formal and fair adversarial hearing at which the State bears the burden of proof. *See* § 53-21-126(2), MCA; *Winick*, at 40.

¶65 Further, it is incumbent upon courts to meaningfully respect and facilitate the exercise of the following requisite standards, in fully discharging the responsibility of safeguarding the due process rights of individuals "at every stage of the proceedings." *See In re L.C.B.*, 253 Mont. at 7, 830 P.2d at 1303. Thus, it is imperative in applying the following standards to the matter at bar, and all subsequent cases, that the constitutional and legislated rights discussed herein are formally and fairly balanced with the State's ultimate power to protect both the individual and the public from actual or perceived harm.

## E. The role of effective counsel in involuntary civil commitment proceedings

¶66 As acknowledged by all parties concerned here, our statutory guidelines under Title 53, Chapter 21, offer little assistance in determining the requisite scope of duties of effective counsel in involuntary commitment proceedings. Nevertheless, the Legislature has provided clear procedural opportunities for counsel to pursue an adversarial role in such proceedings that adequately serve as a framework for our due process analysis.

¶67 Once counsel is appointed, pursuant to § 53-21-122, MCA, counsel "shall meet with the respondent, explain the substance of the petition, and explain the probable course of the proceedings." *See* § 53-21-121(3), MCA. *See also* § 53-21-165, MCA (providing list of records that must be available to "any attorney charged with representing the patient"). Ordinarily, the commitment hearing must take place within five days of a respondent's initial appearance. *See* § 53-21-122(2) and (3), MCA. Under this statute, however, counsel may request additional time.

¶68 Under § 53-21-124(1), MCA, the court may not order detention of a respondent pending the hearing on the petition unless requested by the county attorney and upon the existence of probable cause for detention. At that time, counsel for the patient-respondent may request a detention hearing, which "must be held forthwith." Further, under § 53-21-124(3), MCA, counsel for the patient-respondent may also object to the continued evaluation and treatment by a professional person selected by the patient-respondent pending the hearing.

¶69 Under § 53-21-125, MCA, a patient's counsel may in lieu of a hearing request a jury trial, "whereupon the time set for hearing shall be vacated and the matter set on the court's jury calendar at the earliest date possible, the matter taking precedence over all other matters." Upon a finding that a patient-respondent requires commitment, a court must hold a post-trial "disposition" hearing, pursuant to § 53-21-127(2), MCA. Apparently, in the

case at bar, this second mandatory hearing was simply combined with the hearing on the petition, pursuant to § 53-21-126, MCA.

¶70 In order to further enhance the due process protections under the foregoing statutory mandates, as Amicus suggests, we adopt certain portions of the National Center for State Courts' Guidelines for Involuntary Civil Commitment. *See* 10 Mental and Physical Disability Law Reporter, 409 through 514 (No. 5 1986) (hereinafter *Guidelines*).[10] Thus, the following critical areas shall serve to better define the scope of effective representation in involuntary commitment proceedings, under Article II, Section 17, of the Montana Constitution.

### 1. Appointment of competent counsel

¶71 Under § 53-21-122(2) and (3), MCA, if a judge finds probable cause for the commitment petition, "counsel must be immediately appointed for the respondent." In light of the foregoing statutory mandate, we add that following guideline:

> To be eligible for appointment, attorneys should have specialized course training, or have received supervised on-the-job training in the duties, skills, and ethics of representing civil commitment respondents.

*See Guidelines, Part E1 at 464. At a bare minimum, counsel should possess a verifiably competent understanding of the legal process of involuntary commitments, as well as the range of alternative, less-restrictive treatment and care options available, pursuant to § 53-21-127(2), MCA (listing evaluation and treatment options that court may impose following a disposition hearing, including involuntary medication).*

¶72 Further, state law requires that the "desires of the respondent must be taken into consideration in the . . . confirmation of the appointment of the attorney," under § 53-21-122(2), MCA. In the case at bar, as an example, there is no evidence that any such "desires," which would indicate an informed, knowledgeable decision by the patient-respondent, were ever taken into consideration. Therefore, it is critical that the district court, upon appointment of counsel, provide the patient-respondent with clear and concise information describing the attorney's name and qualifications in order for the patient to then make an informed decision as to whether to accept appointed counsel, or for good cause shown and based on compelling reasons request the appointment of different counsel, or retain alternative representation.

## 2. The initial investigation

¶73 Under § 53-21-165, MCA, a patient-respondent's attorney has a right of access to the client's records. Further, under § 53-21-115(2), MCA, a patient-respondent has the right to "offer evidence, and to present witnesses in any proceeding concerning the person." Also, the patient-respondent has the right to "know, before a hearing, the names and addresses of any witnesses who will testify in support of a petition" and the right to "view and copy all petitions on file with the court" under subsections (3) and (8), of § 53-21-115, MCA.

¶74 Therefore, before and after the required meeting with a patient, under § 53-21-121(3), MCA, counsel should conduct a thorough review of all available records. Such inquiry must necessarily involve the patient's prior medical history and treatment, if and to what extent medication has played a role in the petition for commitment, the patient's relationship to family and friends within the community, and the patient's relationship with all relevant medical professionals involved prior to and during the petition process. In sum, we conclude that the rights afforded a patient-respondent under § 53-21-115, MCA, without the assistance of diligent, competent, and well-informed counsel at the commencement of the critical investigatory stage of the involuntary commitment process, would have little meaning.

¶75 Thus, counsel should be prepared to discuss with his or her client the available options in light of such investigations, as well as the "practical and legal consequences of those options." *See Guidelines*, Part E2 at 465; § 53-21-127(2), MCA. It is likewise imperative that counsel request a reasonable amount of time for such an investigation prior to the hearing or trial on the petition, pursuant to § 53-21-122(2) and (3), MCA.

¶76 Prior to or following the initial client interview, counsel should also attempt to interview all persons who have knowledge of the circumstances surrounding the commitment petition, including family members, acquaintances and any other persons identified by the client as having relevant information, and be prepared to call such persons as witnesses. *See Guidelines*, Part E5(c) at 474. Again, counsel should freely and liberally request a reasonable amount of time for such an investigation prior to the hearing or trial on the petition, pursuant to § 53-21-122(2) and (3), MCA.

## 3. The client interview

¶77 Under § 53-21-121(3), MCA, counsel "shall meet with the respondent, explain the

substance of the petition, and explain the probable course of the proceedings." As indicated by the Commentary to the *Guidelines*, the "prehearing services of an attorney are an indispensable prerequisite for protecting a respondent's interests." *Guidelines*, Part E5 *Commentary,* at 475. *See also* Rule 1.2(a), Montana Rules of Professional Conduct (a lawyer shall abide by a client's decisions concerning the objectives of representation and shall consult with the client as to the means by which they are to be pursued); Rule 1.14 (providing that when a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disability or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client).

¶78 To the foregoing we add the following guideline:

> The initial client interview should be conducted in private and should be held *sufficiently before any scheduled hearings* to permit effective preparation and prehearing assistance to the client.

*See Guidelines, Part E5, at 473 (emphasis added).*

¶79 In addition to explaining the petition and commitment process and the various rights at issue to the client, counsel should also ascertain, if possible, a clear understanding of what the client would like to see happen in the forthcoming commitment proceedings, whether it be arguing for dismissal of the petition, seeking a voluntary commitment status, formulating and then negotiating with the State a least-restrictive alternative to commitment, or agreeing to a State-recommended court-ordered commitment. *See* § 53-21-127(2), MCA (listing options that court may impose following a disposition hearing). The above guideline recognizes that such an understanding may take additional time, due to the client's mental condition and medication, and therefore counsel may need to request a continuation of a scheduled hearing, pursuant to § 53-21-122(2) and (3), MCA.

¶80 Further, it is critical that counsel, through the course of interviewing the client, discuss and determine whether a jury trial should be pursued, pursuant to § 53-21-125, MCA. It is also incumbent upon counsel to facilitate the exercise of the client's right, under §§ 53-21-115(9) and 124(3), MCA, to "be examined by a professional person of the person's choice" and to determine whether the evaluation and treatment should be objected to. *See* § 53-21-124(3), MCA. Finally, counsel should discuss whether a detention hearing, pursuant to § 53-21-124(1), MCA, should be pursued.

## 4. The right to remain silent

¶81 A patient-respondent, under § 53-21-115(6), MCA, has the right to remain silent. This right attaches, pursuant to the introductory language, when a person is "involuntarily detained or against whom a petition is filed." In turn, this provision potentially conflicts with § 53-21-123(1), MCA, which requires after the initial hearing that the respondent "must be examined by the professional person without unreasonable delay."

¶82 Generally, this court-ordered "examination" serves to establish the evidence necessary for involuntary commitment, as indicated by the report submitted to the court in the case at bar, which identified K.G.F.'s "mental background," and "present mental status," through a list of "yes" or "no" criteria, and a handwritten commentary. The professional person, pursuant to § 53-21-123(1), MCA, may take up to four hours to complete the examination.

¶83 We conclude that it is critical for the patient-respondent, via assistance of counsel, to be allowed to make a voluntary and knowing waiver of his or her right to remain silent prior to the commencement of this examination, *see* § 53-21-119(1), MCA, or, in the alternative, that counsel must be present during the "examination" similar to a criminal interrogation or a civil deposition. We emphasize again that the right to counsel cannot under any circumstances be waived. *See* § 53-21-119, MCA. We conclude, therefore, that it would be a patent due process violation for the "examination," as provided for under § 53-21-123, MCA, to be conducted without the assistance of counsel as provided herein.

## 5. Counsel as an advocate and adversary

¶84 To what extent an attorney representing a patient-client in an involuntary commitment proceeding should adopt an "adversarial" posture is a subject of extensive debate among state legislatures and commentators, and is noticeably absent from Title 53, Chapter 21 statutes.

¶85 As indicated earlier, other states have adopted express statutory provisions defining this role. *See*, *e.g.*, Minn. Stat. Ann. § 144.4177 (counsel shall be a "vigorous advocate on behalf of the client"). As the Commentary to the *Guidelines* states: "[w]hen an attorney fails to act as an advocate and assumes a paternalistic or passive stance, the balance of the system is upset, the defense attorney usurps the judicial role, and the defendant's position goes unheard." *Guidelines*, Part E2 *Commentary,* at 466 (internal quotations omitted).

¶86 Accordingly, we agree with the *Guidelines* as well the approach taken in Texas, that the proper role of the attorney is to "represent the perspective of the respondent and to serve as a vigorous advocate for the respondent's wishes." *See Guidelines*, Part E2, at 465. Further:

> To the extent that a client is unable or unwilling to express personal wishes, the attorney should advocate the position that best safeguards and advances the client's interest.

*Guidelines, Part E2, at 465. Additionally:*

> In the courtroom, an attorney should engage in all aspects of advocacy and vigorously argue to the best of his or her ability for the ends desired by the client.

*Guidelines, Part F5, at 483.*

¶87 The foregoing guidelines create the presumption that a client wishes to not be involuntarily committed. The ultimate decision of whether a patient-respondent should be involuntarily committed, therefore, should not be independently made by counsel. *See* Tex. Health & Safety Code Ann. § 574.004 (providing that "regardless of an attorney's personal opinion, the attorney shall use all reasonable efforts within the bounds of law to advocate the proposed patient's right to avoid court-ordered mental health services if the proposed patient expresses a desire to avoid the services").

¶88 Thus, we conclude that pursuant to the foregoing guidelines, evidence that counsel independently advocated or otherwise acquiesced to an involuntary commitment--in the absence of any evidence of a voluntary and knowing consent by the patient-respondent-- will establish the presumption that counsel was ineffective.

¶89 One final statutory consideration is whether a post-trial "disposition" hearing should be conducted separately, utilizing the five-days permitted pursuant to § 53-21-127(2), MCA. Again, a continuation to fully examine and assert a "least restrictive alternative" at a second hearing may be in the client's best interest, and therefore should be pursued by counsel when necessary.

## F. Conclusion

¶90 In summary, we hold that the right to counsel, as provided under Title 53, Chapter 21,

provides an individual subject to an involuntary commitment proceeding the right to effective assistance of counsel. This right affords the individual with the right to raise the allegation of ineffective assistance of counsel in challenging a commitment order.

¶91 We further hold that the foregoing five critical areas of representation define, generally but not exclusively, the scope of effective counsel pursuant to Article II, Section 17, of the Montana Constitution. In turn, the due process afforded individuals under the foregoing standards must serve to protect the fundamental individual liberty interests of dignity and integrity as identified under Title 53, Chapter 21, and Article II, Sections 4 and 10, of the Montana Constitution. We hold that upon a substantial showing of evidence, presented to the issuing district court, or this Court, pursuant to § 53-21-131, MCA, that counsel did not effectively represent the patient-respondent's interests pursuant to the foregoing standards, an order of involuntary commitment should be vacated.

¶92 In so holding here today, we again emphasize that it is not only counsel for the patient-respondent, but also courts, that are charged with the duty of safeguarding the due process rights of individuals involved at *every* stage of the proceedings, and must therefore rigorously adhere to the standards expressed herein, as well as those mandated under Title 53, Chapter 21.

¶93 Finally, the record before this Court, particularly any evidence of the critical pre-hearing investigation, is insufficient. Accordingly, this matter is reversed and remanded for a fact finding hearing and further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

Justice Terry N. Trieweiler dissents.

¶94 I dissent from the majority's decision to reverse the order of the District Court and

remand for further proceedings to determine whether K.G.F. received effective assistance of counsel.

¶95 Although I disagree with the ultimate result arrived at by the majority, I do not disagree with most of what is said in the majority opinion.

¶96 For example, I agree that when a person is subject to involuntary commitment for mental illness, that person has a right to effective assistance of counsel pursuant to Article II, Section 17, of the Montana Constitution. I agree that that right is independent of the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution; and I agree that *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, is not a helpful analytical tool for evaluating whether effective assistance of counsel was provided.

¶97 I agree in general that in determining whether effective assistance of counsel has been provided in a commitment proceeding, it is appropriate to consider the five factors established by the National Center for State Court Guidelines for involuntary civil commitment. However, I believe the application of those five factors will vary from case to case depending on the circumstances and disagree with the formalistic way in which they have been imposed by the majority.

¶98 For example, the extent of the investigation necessary will depend greatly on the nature of the allegations made by the initiating authority and there is no need for this Court to decide ahead of time what the details of each investigation should include. The nature and extent of useful information that can be exchanged at the client interview will depend to a large extent on the mental health of the client. Although I have no disagreement with providing a right to counsel during the examination by the court-appointed professional person, I think it inconsistent that someone involved in a civil commitment proceeding which is for that person's own protection and to which no Fifth Amendment rights attach is afforded a greater right to remain silent and assistance of counsel than is afforded in a criminal proceeding where the ultimate result is punishment and imprisonment. *See Dawson v. State*, 2000 MT 219, ¶¶ 46-48, 301 Mont. 135, ¶¶ 46-48, 10 P.3d 49, ¶¶ 46-48. Finally, while I believe that counsel had an adversarial role to play in a civil commitment proceeding, I believe that counsel's primary obligation is to see that all procedural safeguards are followed and that the State meets its burden of proof. The purpose of involuntary commitment proceedings is to secure skillful and humane treatment for people suffering from a mental disorder which makes them a danger to themselves or others.

While no one should have to bear the stigma of mental illness without being afforded full due process, due process does not require suppressing evidence of a person's intent to harm himself or herself in the name of effective advocacy. I believe that Montana's Involuntary Commitment Act sets forth the basic elements necessary to provide due process as guaranteed by Article II, Section 17, of the Montana Constitution. Those elements are found at § 53-21-115, MCA.

¶99 My problem with the majority opinion is that I can find no evidence in the record that K.G.F.'s counsel was ineffective. There is no indication in the pleadings, transcript, nor briefs filed on appeal that any of the procedural rights statutorily afforded to K.G.F. were denied based on ineffective assistance of counsel. Furthermore, it is clear from the transcript of the hearing that the State was held to its burden of proving that K.G.F. suffered from a mental disorder which threatened her own well being.

¶100 The issues in this case were not that complicated. Proceedings were initiated when Nancy McVean, case coordinator at St. Peter's Hospital, notified the county attorney that K.G.F. suffered from a mental disorder which, when combined with her refusal to take medication, made her a danger to her own well being. McVean reported that on October 19, 1999, K.G.F. discharged her psychiatrist and reported to his office that she had a plan to kill herself. After her threat was reported to the sheriff, she agreed to voluntarily commit herself to St. Peter's Hospital. However, after having a disagreement over medication that was prescribed, she announced her intention to leave. In the opinion of the health care staff at St. Peter's, she did not improve while hospitalized and was at a high risk for suicide if she left the hospital without further care. Therefore, the petition for commitment was filed on October 26, 1999. The petition complied with all the requirements of § 53-21-121, MCA, and no one contends otherwise.

¶101 Immediately after the petition was filed, counsel was appointed to represent K.G.F. pursuant to § 53-21-116 and, most importantly, she was provided with an independent professional examination pursuant to § 53-21-118, MCA.

¶102 At the hearing which was held the following day, the State produced testimony from Nancy McVean who described the history which led K.G.F. to the hospital and further reported an actual suicide attempt by K.G.F. a matter of four months earlier. She reported the diagnosis of bipolar disorder and expressed the opinion that K.G.F. was a danger to herself because of her suicidal inclinations. McVean recommended a community commitment as the least restrictive alternative to stabilize K.G.F.'s condition before

discharging her to aftercare services on an out-patient basis in Bozeman.

¶103 McVean was cross-examined about the drugs which had been prescribed for K.G.F. at St. Peter's Hospital and their side effects.

¶104 Counsel for K.G.F. then called Nancy Adams, an independent professional person, who disputed McVean's opinion that K.G.F. was a threat to herself but agreed that she should be treated further before being released from the hospital. Adams also disagreed that commitment to a community healthcare facility was necessary. It was her opinion that following a period of voluntary treatment at the hospital, K.G.F. could be successfully treated on an outpatient basis in Bozeman.

¶105 K.G.F. testified and agreed that she needed treatment. However, her preference was to receive treatment from a clinical professional and psychiatrist in Bozeman with whom she was already familiar.

¶106 Importantly, neither Adams nor K.G.F. disagreed with the diagnosis reported by McVean. Neither disputed that K.G.F. had previously attempted suicide in June and threatened suicide again two days before her admission to the hospital.

¶107 Counsel had an obligation to serve his client effectively, however, effective representation cannot change reality. In a civil commitment proceeding, if there is no question about a person's mental disorder and no question about the fact that that person presents a danger to herself, then counsel is left to argue for the least restrictive form of commitment. That is exactly what K.G.F.'s counsel did.

¶108 The District Court listened to the evidence presented by the State and the independent professional person called on K.G.F.'s behalf. The District Court had an opportunity to observe K.G.F. during her testimony and consider her prior history of refusing to follow through with voluntary commitment following threats of suicide and chose to accept the recommendation of the State's witness rather than K.G.F.'s witness.

¶109 No one contends that the District Court's findings are not supported by substantial evidence nor does anyone claim that its conclusions of law are incorrect. Nor in the majority opinion is there any example of inadequate performance by K.G.F.'s counsel.

¶110 My concern is this. Having adopted the five-part criteria for evaluating effective

assistance of counsel, does this now mean that following every civil commitment proceeding, a separate hearing will be required to determine the extent of counsel's experience in civil commitment proceedings, the nature and extent of his initial investigation, and the detail provided during his client interview? None of these facts will be apparent from the record and in this record there is nothing to indicate that any of these responsibilities were performed inadequately. How then is this case to be distinguished from any civil commitment appealed in the future?

¶111 While I agree with the general principles established in the majority opinion and applaud the majority's efforts to guarantee consistently capable representation for those people subject to civil and voluntary commitment proceedings, I am concerned about some of the practical effects of the majority opinion and particularly disagree that there is any basis for reversing and remanding the District Court's order in this case. After thoroughly reviewing the record, I can find no evidence that the attorney who represented K.G.F. acted ineffectively or that K.G.F. was denied any of the procedural rights to which she is entitled pursuant to Article II, § 17 of the Montana Constitution and Title 53, Chapter 21, Part 1, of the Montana Code. Therefore, I dissent from the majority's decision to reverse the order of the District Court and remand to the District Court for further proceedings.

/S/ TERRY N. TRIEWEILER

1. The Respondent's name has purposely not been published herein; her initials are used throughout for the purpose of protecting her privacy.

2. The Montana Advocacy Program filed an Amicus Curiae brief in this matter upon stipulation by the parties. The program is a private, non-profit civil rights organization designated as the state's protection and advocacy system for people with disabilities, including people with mental illness. The Montana American Civil Liberties Union signed Montana Advocacy Program's brief, as well.

3. Other states, such as Minnesota, Texas, and Wisconsin, have to a measurable degree statutorily set forth the duties of an attorney in involuntary commitment proceedings. *See*, *e.g.*, Minn. Stat. Ann. § 144.4177 (counsel shall be given adequate time to prepare for all hearings and be a "vigorous advocate on behalf of the client"); Tex. Health & Safety Code Ann. § 574.004(c) (providing that "[r]egardless of an attorney's personal opinion, the attorney shall use all reasonable efforts within the bounds of law to advocate the proposed patient's right to avoid court-ordered mental health services if the proposed patient expresses a desire to avoid the services"); Wis. Stat. Ann. § 51.20(3) (providing that "court shall assure that the subject individual is represented by adversary counsel").

4. Under Title 38, RCM, the forerunner of current law in Montana pertaining to the treatment of seriously mentally ill, a patient apparently had an implied right to "obtain" counsel prior to an involuntary commitment hearing, but one was not appointed, nor guaranteed by statute. If a subsequent jury trial was requested by a committed person or relative, a county attorney would represent the person, under § 38-213(2), RCM. Further, as evidenced by this Court's decision in *Petition of Kolocotronis* (1965), 145 Mont. 564, 402 P.2d 977, the hearing could take place "at the bedside of the patient" in the hospital. *See* § 38-201, RCM. Needless to say, Kolocotronis did not have counsel present at the hospital hearing--although the Court took notice that his mother was present--and on appeal he challenged his commitment to the state hospital at Warm Springs *pro se*. Although ruling that Kolocotronis was provided the opportunity to obtain counsel, the Court did not address Kolocotronis's other constitutional challenge that he did not have the opportunity to "gather witnesses to challenge the commitment."

5. Under § 53-21-102, MCA, "mental disorder" means an organic, mental, or emotional impairment that has substantial adverse effects on an individual's cognitive or volitional functions, and does not include addiction to drugs or alcohol, drug or alcohol intoxication, mental retardation, or epilepsy.

6. The 2001 Montana Legislature, under Senate Bill No. 466, doubled the length of certain involuntary commitments provided pursuant to § 53-21-127(2), MCA. Now, under what will become § 53-21-127 (3), MCA, patient-respondents, such as K.G.F., may be involuntarily committed to a "community facility, or program, or to any appropriate course of treatment, which may include housing or residential requirements, for a period of not more than 6 months." Under prior law, an involuntary commitment to a "community facility, program, or course of treatment" could not exceed three months. Further, SB 466 struck out subparts (iii) through (v), which offered the "least restrictive alternatives" of ordering the respondent to be placed in the care and custody of a relative or guardian or some other appropriate place other than an institution, ordering outpatient therapy, or making some other appropriate order for treatment. The effect of the foregoing statutory amendments on the constitutional rights at issue and under discussion in this opinion are not before us, however.

7. The 2001 Montana Legislature, under Senate Bill No. 107, established the use of two-way electronic audio-video communication for the initial hearing under § 53-21-122, MCA; the detention hearing under § 53-21-124, MCA, the trial or hearing on a petition under § 53-21-126, MCA; the hearing on post-trial disposition under § 53-21-127, MCA; a hearing on the extension of a commitment period, under § 53-21-128, MCA; a hearing on re-hospitalization of a conditionally released person under § 53-21-197, MCA; and a hearing on an extension of the conditions of release under § 53-21-198, MCA. Under Senate Bill No. 107, the use of the two-way electronic audio-video communication is at the discretion of the court. The effect of the foregoing statutory amendments on the constitutional rights at issue and under discussion in this opinion are not before us, however.

8. For example, the "title" of Title 38, RCM, which was largely repealed by the time Title 53, Chapter 21, became law in 1975, was "Insane and Feeble-Minded." Under § 38-602, RCM (repealed in 1969), the term "inmate" was defined as "an idiot, feeble-minded, insane or epileptic person who is treated, trained, or cared for within a custodial institution."

9. The U.S. Supreme Court's *Buck v. Bell* decision involved a challenge to the then predominant eugenical sterilization laws in effect in this country. Such laws in Montana, *see* § 38-601, *et. seq*., RCM, which were codified in 1923, were not repealed until 1969. Montana's Legislature provided that the purpose of involuntary sterilization, under § 38-608, RCM, was "for the betterment of the physical, mental, neural or psychic condition of said inmate, or to protect society from the menace of procreation by said inmate, and not in any manner as a punitive measure." *See also Armstrong*, ¶ 50 (discussing eugenical laws and the *Buck v. Bell* decision).

10. The Mental and Physical Disability Law Reporter is published bimonthly by the American Bar Association. The *Guidelines* were prepared by a National Task Force of the National Center for State Courts Institute on Mental Disability and the Law, and resulted from a multi-year project. *See also* ABA Commission on the Mentally Disabled, *How to Prepare for an Involuntary Civil Commitment Hearing*, 37 No. 1 Prac. Law. 39 (1991).