JUSTICE WARNER
dissents.
¶47 I must dissent. This case presents an example of problems faced by district courts in the rural areas of Montana in dealing with those unfortunate persons alleged to be seriously mentally ill and possibly in need of commitment.
¶48 A reading of the Court’s statement of what the Sheriff and the Police Sergeant found when called to C.R.C.’s trailer could lead one to believe that what they should have done is leave her to go about her business. However, we were not there. We did not see her, hear her shouts, assess her demeanor, view or smell her living conditions, know the surrounding area, see her when inspecting the hillside for those imps who were not there, and we are not able to assess the degree of fear in those hearing the gunfire. The deputies did consult with mental health professionals by telephone, and were advised that C.R.C. should be taken to the hospital. As an appellate judge, I am not willing to now find as a fact that these trained officers overcame C.R.C.’s resistance and forced her to go to the hospital for an examination because they had some animus toward her.
¶49 Once at the hospital, a licensed physician, who the State has determined qualified to make such an assessment, examined C.R.C. and told the Lincoln County Attorney that she was in need of commitment. The County Attorney, whom the law has granted discretion to make such decisions, exercised his discretion to present the matter to a District Judge.
¶50 The petition informed the District Court that a 50 year-old woman had been the subject of numerous calls to law enforcement, law enforcement advised she was living without electricity or running water, she was hallucinating, medical professionals observed that she exhibited paranoia, and neighbors reported shots had been fired after a heated argument she had been involved in. The most chilling and sad part of the petition was the diagnosis by a health care professional that this unfortunate woman, without fault on her part, was psychotic; that is, in layman’s terms, she had lost touch with reality.
¶51 Unfortunately, Libby does not have the luxury of a mental health center, a psychiatric ward if you will, where C.R.C. could be suitably detained. Thus, a quick hearing was not only required by §§ 53-21-122(3), 125, MCA, things had to move swiftly as a practical matter. Nor does Lincoln County have a number of psychiatrists or certified mental health professionals, one of whom would also be available for *145 the coming trial.
¶52 Acting on the petition, the District Court promptly followed the requirements of § 53-21-122(2), MCA; found probable cause to detain C.R.C., appointed an experienced lawyer to represent C.R.C., appointed a social worker as a friend of C.R.C., a mental health professional to examine her, and set a trial date. As counsel for C.R.C. did not demand a jury, and did not waive the time limitations, the trial had to be within five days and it made no difference whether the mental health professional first appointed would be available. Section 53-21-122(3), MCA. The District Court, in fairness, made it known that the medical professional who made the report attached to the petition might not be available at trial.
¶53 At trial neither C.R.C. nor her counsel made any objection that the mental health professional who testified, Eric Greenberg, M.A., was not qualified, was not properly appointed, or had not conducted a proper examination.
¶54 At the conclusion of the trial the District Court, in addition to finding C.R. C. suffers from a mental disorder, psychosis with agitation, entered the finding of fact quoted by the Court at ¶ 15.
¶55 Unfortunately, the District Court made what I would posit is a mistake. It named Dr. Mark Heppe, M.D., in its finding of fact. Dr. Heppe did submit the initial report, but did not testify. Instead, Eric Greenberg, a certified mental health professional, submitted a report and did testify at the trial. A clerical mistake like this could be corrected nunc pro tunc. Rule 60(a), M.R.Civ.P. However, if the Court concludes this is not a mistake, or deems that such is fatal, it should just say so and reverse. Instead, the Court attempts to justify its decision to ignore the facts provided by Greenberg’s testimony for the reasons that he did not conduct a thorough enough examination and he was not appointed as the mental health professional by formal order entered in the record. As noted above, neither of these matters was objected to by C.R.C. in the District Court and neither was argued before this Court. The appellate argument of C.R.C. is that the evidence, including that provided by Greenberg, is insufficient to support the District Court’s finding of fact pursuant to §§ 53-21-126, 127, MCA, that she should be involuntarily committed for mental health treatment.
¶56 I would not ignore the testimony of Greenberg. I believe it is important and, when it is considered, the evidence is sufficient for the District Court to find, beyond a reasonable doubt, that C.R.C. required commitment under the criteria of § 53-21-127(8)(a) - (d), MCA. He *146 testified that for the three days before she was taken to the hospital, C.R.C. had reported hearing chanting and howling on the hill behind her house that she said was related to some kind of Satanic activity. He said she had advised him that she believed “burning down” the hill would resolve the problem. She also thought the treatment she had received from the police would justify shooting them. He felt these statements, along with her actions when she was with him, lead to a diagnosis that she was psychotic and needed to be committed.
¶57 This tale about Satanic activity on the hill behind her trailer and shooting people was also testified to by Sheriff Anderson, albeit in a disjointed fashion. Deputy Jacobson, who was also at C.R.C.’s trailer when she was taken to the hospital, echoed that she described terrible noises from the hillside characterized as grinding, rattling, or moaning.
¶58 C.R.C. herself testified. While she simply refused to elaborate on exactly what she thought was going on up the wooded hill behind her trailer, she did say that for the three days just prior to the time she was taken to the hospital she heard chanting, howling and shrieking coming from the hill at daybreak. She said that some type of signs were left on the hill by a Hells Angel, or terrorists. She also said that these noises and signs probably had something to do with a son of hers who had gone up the same hill and had returned with an implanted perverted eye in his forehead.[1]
¶59 As the District Court remarked, this was not an open and shut case. However, the judge was presented with evidence that C.R.C. was highly agitated and had created a disturbance. She believed there was some evil, supernatural presence on the wooded hillside behind her house, and fire was the way to be rid of it. She also felt justified in shooting some law enforcement officers. The judge had before him the definite diagnosis of a certified mental health professional that C.R.C. was actively psychotic, a danger to herself and others, and required commitment. Not only did the District Judge hear the witnesses, he listened to the testimony of C.R.C. herself, and was able to form a judgment about her condition.
¶60 The record reflects that there was no suitable mental health treatment for C.R.C. available in Libby. The judge was therefore presented with two choices, (a) disagree with the mental health *147 professional and send C.R.C. back to her trailer, hoping for the best, or (b) accept the evidence and order up to 90 days of treatment at the State Hospital. I conclude that the objective evidence of the instant, overt disturbance caused by C.R.C., the uncontradicted evidence of the reasons therefore, the actions of C.R.C. when confronted with the need to be examined, her testimony, and the opinion of the mental health professional, are, as a matter of law, sufficient to satisfy the statutory requirements. Sections 53-21-126,127, MCA. Adding to this the ability of the District Court to see and hear the witnesses before finding the facts, I do not think a reversal is justified.
¶61 Having said that I disagree with the result reached by the Court, I must agree that the Court fairly criticizes the findings of fact in this case. Section 53-21-127(8)(a), MCA, requires detailed findings of fact, not the summary provided here. District courts must resist the pressure applied by sheriffs and county attorneys to immediately sign written findings of fact, conclusions of law and orders so that a committed mentally ill person may be transported to the State Hospital as quickly as possible. It is understandable why a sheriffs deputy is often standing outside the judge’s chambers waiting for the order. In the rural counties there is no place to house the mentally ill while awaiting the necessary court papers, and in every county the cost of a delay is very large. However, wait a reasonable time they must. The law requires an extraordinarily accurate and complete record in these cases, and it must be provided.
¶62 I do not agree with the tenor of In re Mental Health of K.G.F., 2001 MT 140, 306 Mont. 1, 29 P.3d 485, and the special concurrence here, which seem to imply that law enforcement, county attorneys and district courts harbor some kind of prejudice against, or disdain for, the mentally ill. If a proper case presents itself, I am prepared to stand with those that have criticized K.G.F.[2] The rights of our mentally ill citizens are taken very seriously by law enforcement, county attorneys and the district courts. There is a great deal of concern with, and sympathy for, their plight. It is the lack of resources that makes it so difficult to provide the assistance they need, deserve and have a right to; it is not prejudice or indifference.
¶63 I dissent.

 The transcript seems to indicate that C.R.C. was not talking about a biological child when she said “son”, but rather she usually referred to some people she associated with as her family and her kids.

 See, Blaine M. Dahl, Note, Taking Liberties: Analysis of In re Mental Health of K.G.F., 64 Mont. L. Rev. 295, 307 (2003).