No. 01-528

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 134

MARK EDWARD WALKER,

Petitioner and Appellant,

v.

STATE OF MONTANA,

Respondent and Respondent.

APPEAL FROM:     District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. CDC 94-337
The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Chad Wright, Appellate Defender, Helena, Montana; Sunday Z. Rossberg,
Rossberg Law Office, Great Falls, Montana

For Respondent:

Mike McGrath, Montana Attorney General, Diana Leibinger Koch, Special
Assistant Montana Attorney General, Helena, Montana; Brant S. Light,
Cascade County Attorney, Michael Rausch, Deputy Cascade County
Attorney,                Great Falls, Montana

Submitted on Briefs:  September 5, 2002

Decided:  April 29, 2003

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Mark Edward Walker appeals an order of the District Court for the Eighth Judicial District, Cascade County, denying Walker's Petition for Postconviction Relief. Walker had alleged in his petition that he was the victim of cruel and unusual punishment at the hands of Montana State Prison (MSP) officials. We reverse and remand for further proceedings consistent with this Opinion.

¶2     We address the following issues on appeal:

¶3     1. Whether Walker's appeal is moot because he has been released from custody.

¶4     2. Whether Walker sought relief in an appropriate proceeding within his Petition for Postconviction Relief.

¶5     3. Whether "Behavior Management Plans" constitute cruel and unusual punishment when such plans exacerbate an inmate's mental health condition.

## Factual and Procedural Background

¶6     On December 13, 1994, Walker was charged in Cascade County with felony forgery, arson, and two counts of criminal mischief. Walker admitted forging his brother's signature on several checks. The other two charges stemmed from a fire started on a tarp covering a motorcycle in his parents' garage. Walker claimed that the fire was an accident.

¶7     At the time, Walker had been diagnosed with Attention Deficit Hyperactive Disorder (ADHD) for which he was taking Ritalin. Walker pleaded guilty to negligent arson and felony forgery on July 25, 1995, in exchange for dismissal of the criminal mischief charges. On December 18, 1995, the District Court sentenced Walker to five years with the Department of Corrections with all five years suspended. Walker subsequently violated the

terms of his probation and the State filed a petition to revoke his suspended sentence.

¶8     While awaiting revocation proceedings, Walker absconded. He was arrested in Colorado on December 29, 1997, on a charge of giving false information to a pawn broker. Walker remained incarcerated in Colorado until November 6, 1998, when he was extradited to Montana.

¶9     While incarcerated in Colorado, Walker underwent a mental health evaluation and was diagnosed with Hebephrenic Schizophrenic Disorder. That diagnosis was later changed to Bipolar Disorder. Between April 19, 1998, and November 6, 1998, the psychiatric staff of the Colorado Department of Corrections prescribed various medications to treat Walker's mental disorder. They eventually settled on a regimen which included Lithium. Walker was taking 300 milligrams of Lithium three times a day for a total of 900 milligrams each day. For the seven months Walker was taking Lithium while incarcerated in Colorado, the staff reported that his mood was more predictable and he did not receive any major disciplinary write-ups.

¶10    On November 6, 1998, Walker was transported from Colorado to the Cascade County Detention Center. On December 8, 1998, after a hearing, the District Court revoked Walker's suspended sentence and resentenced him to five years with the Department of Corrections. Walker was transferred to MSP on February 5, 1999.

¶11    Walker is six feet two inches tall. Because he is hypoglycemic, Walker has difficulty keeping on weight. At the time of the hearing on his petition for postconviction relief, Walker weighed 140 pounds. While incarcerated, his weight fluctuated from a high of 155

pounds while in Colorado, to a low of 129 pounds while locked down in maximum security (Max) at MSP. In addition, Walker is legally blind. The vision in his left eye measures 1/100, while the vision in his right eye measures 20/80. Walker does not have peripheral vision. Besides his regular corrective lenses, Walker uses a "funnel scopic lens" on top of his glasses which acts like binoculars.

¶12 Walker also suffers from a nystagmus problem which makes both of his eyes twitch constantly and forces him to turn his head to the side when speaking to other people. Also, Walker's mode of speech is "pressured," meaning that his speech and thought processes are so rapid that it is difficult to keep up with him. A prison psychologist described Walker's thoughts as coming out like "a fire hose rather than a garden hose" and that it was difficult to slow or stop the stream of thought, "like trying to cap a fire hydrant while it's flowing."

¶13 While at the Cascade County Detention Facility, Walker was taking his Lithium only sporadically. On February 5, 1999, Walker's first day at MSP, the intake officer described him as quiet, timid and cooperative. In his intake form, Walker notified MSP that he had been diagnosed as Bipolar and that he was receiving Lithium for his condition. On February 10, 1999, Walker notified MSP staff psychiatrist, Dr. David Schaefer, that he was experiencing stomach pains due to the Lithium. He requested that a snack be provided to accompany his medication and alleviate the nausea associated with taking his Lithium. Walker also requested that Dr. Schaefer review his medical records. Shortly after these requests, Walker stopped taking his Lithium. Thereafter, Walker's behavior showed a progressive decline.

4

¶14     For the first six months after his arrival at MSP, Walker averaged only two severe disciplinary infractions a month. Then, in August 1999, Walker was moved to Max after he broke a sprinkler head and claimed that he had swallowed it. For the next six months, Walker averaged eleven severe disciplinary infractions a month. According to various correctional officers, Walker had transformed from a timid and quiet inmate into an excited, belligerent, hostile, disruptive and suicidal inmate.

¶15     The officer who initially processed Walker on his arrival at MSP, later observed that Walker was refusing to eat and was losing a lot of weight. Although that officer said he tried to convince Walker to eat, Walker refused claiming that the slot that his food was passed through was filthy. Another officer testified that Walker would holler for hours, sometimes for the entire length of the officer's eight-hour shift. Still another officer reported that Walker was one of the most disruptive inmates that he had seen in five years of working in Max. That officer notified the mental health staff three or four times about Walker, but he did not see any follow up. Other inmates reported that Walker would scream all night long and one inmate reported that Walker would pound continuously on his sink. An inmate housed near Walker described Walker's moods as ranging from depressed and moody to "happy as shit."

¶16     Other instances of Walker's disruptive behavior consisted of spitting on officers; covering his cell walls with ketchup, mustard and mayonnaise; throwing his food tray out his food slot and onto the floor; covering his cell window to prevent officers from seeing in; and purposely flooding his cell. Walker also refused to comply with direct orders from the

5

officers.  On two occasions, officers had to use pepper spray on Walker and forcibly remove him from his cell.

¶17     Walker's behavior culminated in three suicide attempts.  On October 7, 1999, Walker was evaluated by medical staff for swallowing a staple.  The psychiatrist noted in his report following that incident that Walker was a chronic risk for self-harm.  On October 8, 1999, Walker tried to hang himself with a sheet.  And, on  October 12, 1999, he tried to hang himself with his prison overalls.

¶18     Both the guards and the inmates quickly tired of Walker's behavior.  Hence, Walker was put on a series of Behavior Management Plans (BMPs).  In its response brief on appeal, the State agreed with the characterization in Walker's brief concerning the BMPs on which the prison placed Walker.  These BMPs were characterized by Walker as follows:

¶19     BMPs are prison management tools using "a carrot-and-stick approach" of withdrawing and returning privileges based on conduct.  BMPs are supposed to be "a tool of last resort" when all other options for discipline have been exhausted.  To prevent abuse, BMPs cannot be initiated by a single guard, and are supposed to have other fail-safe measures in place, such as review by mental health staff.

¶20     BMPs are only implemented and completed in the A-block area of Max.  A-block is a detention unit designed for disciplinary punishment.  The inmates in A-block are only provided with the bare necessities. Each cell has a cement bed, a cement table or desk, a stainless steel sink, a stainless steel toilet and a stainless steel plate that serves as  a mirror.  None of these fixtures are removable.  The cell has an intake vent and an exhaust vent to

6

circulate air. The cell does not have a window to the outside, so no natural light enters the cell. There is a single light fixture in the ceiling and the guards control the lighting. The light remains on 12 to 16 hours a day. No recreation yard time is allowed for inmates in A-block.

¶21 BMPs further curtail the already restricted detention created in A-block and are designed to last 24 to 48 hours. BMPs are not meant to be therapeutic, they are used as a tool to manage dangerous behavior. If a BMP continues beyond a week, prison mental health services are supposed to conduct a formal review of the plan.

¶22 Walker was transferred to A-block on August 25, 1999. While on A-block, MSP officials implemented five separate BMPS for Walker even though they conceded that Walker did not respond well to progressive discipline. Walker's first BMP was initiated on September 6, 1999, after he flooded his cell. This BMP lasted until September 11, 1999.

¶23 Walker was placed on another BMP on October 8, 1999, after he attempted to hang himself with a sheet. The previous day, Walker swallowed a metal staple and attempted to block his window. On October 10, 1999, Walker cut himself by breaking off a piece of his food tray and concealing the sharp piece in his cell. On October 12, 1999, Walker tried to hang himself with his coveralls, hence he was sent to the infirmary for several days. On October 18, 1999, Walker was returned to his cell in A-block. He was stripped of all of his clothing and put in his cell naked. He was not permitted to have bedding or a pillow and the water to his sink and toilet were turned off. The guards controlled the water and turned it on at regular intervals. Walker was given a "space" or "suicide" blanket consisting of two

7

wool blankets sewn inside a canvas cover. Walker remained in his cell, naked, with only his suicide blanket for four days.

¶24    As part of the BMP, Walker was not allowed to have hot meals. Instead, he was provided with "finger food"--individually wrapped slices of meat and cheese served with bread. The guards would order Walker to the back of his cell and tell him to face the wall. They would then place the food on a slot in the door. Sometimes the food was wrapped in plastic and other times the officers would unwrap the food before placing it on the slot. This was the same slot where toilet cleaning tools and other cleaning supplies were passed through prompting Walker's refusal to eat unwrapped food placed on the slot claiming that the slot was filthy.

¶25    BMPs were only designed to last for 24 to 48 hours. On this BMP, Walker had to have 24 hours of clear conduct before clothing and other necessities would be returned to him. However, on October 20, 1999, Walker received additional write-ups for trying to block his cell window, thus no items were returned to him. On October 22, 1999, Walker's mattress was returned to him and, on October 23, 1999, his pillow was returned to him. Walker was still naked and he received another disciplinary write up for again trying to cover his window. On October 27, 1999, prison officials returned control of the sink and toilet water to Walker. On October 28, 1999, Walker began receiving regular hot meals served on a tray. On October 29, 1999, after eleven days of being naked in his cell, Walker received underwear, coveralls and thermal underwear. MSP officials then returned Walker to regular detention status.

8

¶26  On December 9, 1999, MSP officials forced Walker into a third BMP after Walker covered his cell window, threatened to harm himself, and flooded his cell block. Prison officials once again removed Walker's clothing and placed him in his cell with only his underwear, a suicide blanket and a mattress. In this BMP, prison officials determined that Walker needed 72 hours of clear conduct, rather than the previously established 24 hours, before returning any basic items. This BMP ended on December 15, 1999, when Walker was transported to Great Falls for a court date.

¶27  On January 1, 2000, prison officials commenced a fourth BMP against Walker because he wrote a threatening letter to MSP staff. Once again Walker was stripped naked and only given a suicide blanket to keep warm. Again, his access to water was restricted and he was given only finger foods. On January 12, 2000, MSP officials returned Walker's mattress, and the following day, they returned his pillow. On January 15, 2000, his clothing was returned. For two weeks, Walker had remained in his cell naked. MSP records indicate that while on this BMP, mental health staff did not review Walker's mental health status every seven days as required by prison policy. Walker completed this BMP on January 18, 2000.

¶28  On February 26, 2000, MSP officials started Walker's fifth BMP because Walker claimed to have taken some pills in another suicide attempt. All of Walker's clothing and bedding were taken away. Walker was again forced to sleep naked on a concrete bunk with nothing but a suicide blanket for warmth for over a week. On March 4, 2000, Walker's mattress was returned to him. On March 5, 2000, he received his pillow. On March 6, 2000,

9

after nine days of being naked in his cell, MSP officials returned his coveralls. Walker completed this BMP on March 11, 2000.

¶29 Several correctional officers later testified that they noticed no difference in Walker's behavior whether he was on or off a BMP. They also reported that the BMPs often failed to prevent further disruptive or dangerous behavior by Walker.

¶30 In January 2000, Walker, while on a BMP, filed a *pro se* petition with this Court. Because he was without any writing utensils or paper, Walker dictated his petition to a neighboring inmate. In his petition, Walker alleged that he was the victim of cruel and unusual punishment at the hands of MSP officials. He reported that while placed on "lock-up status," his clothes were taken away, he was housed in a cell with human blood and waste, he was forced to sleep naked on a concrete slab without a mattress, his food was served in an unsanitary manner, and he was deprived of drinking water.

¶31 We treated Walker's petition as a Writ of Mandamus and issued an Order on March 9, 2000, wherein we remanded the case to the Eighth Judicial District Court. We also ordered that counsel be appointed to investigate conditions of Walker's imprisonment and, if warranted, file a petition for appropriate relief in the District Court. Pursuant to this Court's Order, attorney Eric Olson commenced an investigation into the facts and circumstances of Walker's allegations. On March 24, 2000, Olson filed, on Walker's behalf, a Petition for Postconviction Relief in the District Court wherein he alleged irregularities in Walker's sentencing. And, on May 26, 2000, Olson filed a Petition for Extraordinary Relief in this Court alleging that MSP had subjected Walker to cruel and unusual punishment. The two

10

cases were eventually consolidated into one postconviction proceeding.

¶32    In his Memorandum in Support of Petition for Extraordinary Relief, filed on May 26, 2000, Olson provided examples of the cruel and unusual punishment he noted as a result of his investigation. These included excessive use of force; depriving Walker of sanitary housing and exposing him to unsanitary conditions by forcing him to live in a cell that contained blood, feces, and other human excretory material; depriving Walker of food and water under the guise of a BMP; violating prison policies and procedures by tampering with Walker's legal mail; badgering Walker in order to provoke punitive sanctions; inflicting sanctions on Walker solely for the purpose of punishment; subjecting Walker to threats of force; and holding Walker up to scorn and ridicule. Olson also suggested that Walker's mental illness has been exacerbated by the conditions and treatment at MSP and he requested that an independent psychiatrist review any further BMPs to which the prison proposed to subject Walker.

¶33    Counsel for the Montana Department of Corrections (the Department) asked the District Court to disregard Walker's Memorandum in Support of his Petition for Extraordinary Relief because Walker had not requested appropriate relief within the context of a petition for postconviction relief. Counsel argued that Walker did not meet any of the contingencies in § 46-21-101, MCA, the postconviction relief statute; that the District Court could not grant Walker the relief he requested in a petition for postconviction relief; and that the only appropriate proceeding for Walker's claims of cruel and unusual punishment was a civil rights action. The District Court denied the Department's request.

¶34 The District Court heard testimony in this case on ten separate days in August, September and October, 2000. The court also received testimonial video depositions of MSP inmates who witnessed and corroborated the information provided by Walker and his attorney. On February 14, 2001, the court issued its Findings of Fact, Conclusions of Law and Order wherein the court determined that Walker had not met his burden of proof to succeed on any of the issues in his petition for postconviction relief and that Walker was not subjected to cruel and unusual punishment under either the Eighth Amendment to the United States Constitution or Article II, Section 22 of the Montana Constitution. Hence, the court denied all relief requested by Walker.

¶35 Walker now appeals the District Court's conclusions of law that the prison's BMPs and the conditions in A-block do not constitute cruel and unusual punishment. Walker was discharged from MSP on August 10, 2001, after he filed his notice of appeal. He has completely discharged his sentence and is not on probation or parole. Consequently, the State moved to dismiss Walker's appeal as moot. In an Order dated September 18, 2001, we denied the State's motion as premature because Walker had not yet filed his brief on appeal. However, we denied that motion "without prejudice to the State's right to renew its motion after the issues on appeal are more clearly defined." The State has again raised that issue in its Response brief on appeal.

**Standard of Review**

¶36 We review a district court's denial of a petition for postconviction relief to determine whether that court's findings are clearly erroneous and whether its conclusions of law are

12

correct. *State v. Thee*, 2001 MT 294, ¶ 6, 307 Mont. 450, ¶ 6, 37 P.3d 741, ¶ 6.

## Issue 1.

¶37 *Whether Walker's appeal is moot because he has been released from custody.*

¶38 The State argues on appeal, that because Walker only appeals the issues related to the conditions of his confinement, there is no relief the court can grant him, thus, his appeal is moot. The State also argues that the facts of this case do not meet the criteria for an exception to the mootness doctrine because it is not capable of repetition while evading review.

¶39 Walker argues, on the other hand, that this case is not moot because his release from MSP has not freed him from the residual effects of his deteriorated mental state caused by his treatment at MSP. He also argues that this case warrants exception to the mootness doctrine because other inmates housed in Max, especially other mentally ill inmates, could be subjected to "the same filthy, inhumane conditions of confinement" as he experienced and the abuses endured by those inmates could escape review because those inmates fear retaliation by correctional officers.

¶40 Mootness is a threshold issue that must be resolved before we can address the underlying dispute. *Grabow v. Montana High School Ass'n*, 2000 MT 159, ¶ 14, 300 Mont. 227, ¶ 14, 3 P.3d 650, ¶ 14 (citing *Shamrock Motors, Inc. v. Ford*, 1999 MT 21, ¶ 17, 293 Mont. 188, ¶ 17, 974 P.2d 1150, ¶ 17). "A matter is moot when, due to an event or happening, the issue has ceased to exist and no longer presents an actual controversy. A question is moot when the court cannot grant effective relief." *Grabow*, ¶ 14. We have

13

recognized an exception to the mootness doctrine for controversies that are capable of repetition, but that may evade review. *Common Cause v. Statutory Committee* (1994), 263 Mont. 324, 328, 868 P.2d 604, 606-07; *Butte-Silver Bow Local Gov't v. Olsen* (1987), 228 Mont. 77, 82, 743 P.2d 564, 567.

¶41     This Court "reserves to itself the power to examine constitutional issues that involve the broad public concerns to avoid future litigation on a point of law." *In re Mental Health of K.G.F.*, 2001 MT 140, ¶ 19, 306 Mont. 1, ¶ 19, 29 P.3d 485, ¶ 19 (quoting *In re N.B.* (1980), 190 Mont. 319, 322-23, 620 P.2d 1228, 1230-31, *superseded in part by statute as stated in In re J.M.* (1985), 217 Mont. 300, 304-05, 704 P.2d 1037, 1040). In *In re N.B.*, N.B. was involuntarily committed to Warm Springs State Hospital for three months of evaluation and treatment. We concluded in that case that important constitutional questions were not rendered moot by N.B.'s release from Warm Springs. *In re N.B.*, 190 Mont. at 322-23, 620 P.2d at 1231.

¶42     In like manner, in *K.G.F.*, a woman was involuntarily committed to a mental health facility. She contended that she was denied effective assistance of counsel during the course of the commitment proceedings. We concluded in *K.G.F.* that the controversy was not moot even though K.G.F. was no longer subject to the 90-day commitment order because the claimed constitutional right to effective assistance of counsel in civil involuntary commitment proceedings is "capable of repetition, yet evading review." *K.G.F.*, ¶ 20 (citation omitted).

¶43     Walker maintains, and we agree, that similarly to *K.G.F.*, this case involves

constitutional questions. We phrase the first question as: Whether MSP disciplinary techniques rise to the level of cruel and unusual punishment when such conditions exacerbate an inmate's mental health condition. We phrase the second question as: Whether the use of BMPs in the manner described and the living conditions on A-block violate an inmate's inviolable right to human dignity under Article II, Section 4 of the Montana Constitution. Both questions implicate fundamental constitutional rights and as long as the current prison policies are in place, the problems will repeat themselves.

¶44 Moreover, the problems involved could otherwise evade review because BMPs are intended to last only a few days, barely enough time to file a complaint let alone for the issue to come before this Court. Nevertheless, the State argues that the District Court cannot grant the relief that Walker seeks because he is not now, nor will he be in the foreseeable future, subject to the prison's BMPs and any ruling from this Court would be advisory only. However, MSP continues to use BMPs and there is no doubt that they could again be used in the context of inmates with serious mental health problems, such as Walker.

¶45 Accordingly, we hold that Walker's appeal is not moot merely because he has been released from custody.

**Issue 2.**

¶46 *Whether Walker sought relief in an appropriate proceeding within his Petition for Postconviction Relief.*

¶47 The State argues that the District Court was incorrect in concluding that a postconviction relief proceeding is an appropriate proceeding in which Walker could raise issues about the conditions of his confinement. Since Walker brought his claims in a petition

15

for postconviction relief, the State contends that pursuant to § 46-21-101, MCA, the District Court did not have the ability to award Walker the relief he sought, but could only vacate, set aside, or correct the sentence. Contrary to the State's contentions, Walker argues that whether a postconviction relief proceeding is appropriate here is not subject to review at this juncture because the State failed to raise that issue by way of a cross-appeal.

¶48    "In order to preserve an issue not raised by an appellant, a respondent must file a notice of cross appeal." *Billings Firefighters Local 521 v. City of Billings*, 1999 MT 6, ¶ 31, 293 Mont. 41, ¶ 31, 973 P.2d 222, ¶ 31 (citing *Gabriel v. Wood* (1993), 261 Mont. 170, 178, 862 P.2d 42, 47). In addition, we noted in *Joseph Eve & Co. v. Allen* (1997), 284 Mont. 511, 514, 945 P.2d 897, 899, that

> this Court has long held that the time limits for filing an appeal are mandatory and jurisdictional. "An appellant has a duty to perfect its appeal in the manner and time provided in Rule 5. Absent this compliance, this Court lacks jurisdiction to hear the appeal." *Foster Apiaries, Inc. v. Hubbard Apiaries* (1981), 193 Mont. 156, 159, 630 P.2d 1213, 1215 (citing *Price v. Zunchich* (1980), 188 Mont. 230, 612 P.2d 1296).
>    In a similar fashion, this Court has held that *the failure to properly file a cross appeal precludes this Court from addressing the issues raised in the cross appeal.* [Emphasis added.]

¶49    Moreover, we have repeatedly stated that although Rule 14, M.R.App.P., "provides for review of matters by cross-assignment of errors, this does not eliminate the necessity for cross-appeal by a respondent who seeks review of matters separate and distinct from those sought to be reviewed by appellant." *Joseph Eve & Co.*, 284 Mont. at 514, 945 P.2d at 899 (quoting *Mydlarz v. Palmer/Duncan Const. Co.* (1984), 209 Mont. 325, 334, 682 P.2d 695, 700). *See also Baldwin v. Orient Express Restaurant* (1990), 242 Mont. 373, 377, 791 P.2d

49, 51; *Tigart v. Thompson* (1989), 237 Mont. 468, 475, 774 P.2d 401, 406; *Johnson v. Tindall* (1981), 195 Mont. 165, 169, 635 P.2d 266, 268; *Francisco v. Francisco* (1948), 120 Mont. 468, 470, 191 P.2d 317, 319.

¶50　Accordingly, we hold that this issue is not properly before us, hence we will not address it.

**Issue 3.**

¶51　*Whether BMPs constitute cruel and unusual punishment when such plans exacerbate an inmate's mental health condition.*

¶52　The District Court determined that Walker had not met his burden of proof to succeed on any of the issues in his petition for postconviction relief and that Walker was not subject to cruel and unusual punishment under either the Eighth Amendment to the United States Constitution or Article II, Section 22 of the Montana Constitution.  Hence, the court denied all relief requested by Walker.

¶53　The State argues on appeal that the District Court was correct in concluding that MSP's treatment of Walker did not amount to cruel and unusual punishment.  The State maintains that MSP did not deliberately disregard an excessive risk to Walker's health or safety, but only made an informed decision to employ BMPs to try to control Walker's aberrant, disruptive, and  dangerous behavior.

¶54　Walker argues, on the other hand, that the District Court erred in failing to find that imposing BMPs on mentally ill inmates amounts to cruel and unusual punishment in violation of the cruel and unusual punishment provisions of both the Eighth Amendment and Article II, Section 22 of the Montana Constitution.  The Eighth Amendment provides:

17

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  Article II, Section 22 is nearly identical.

¶55    Walker also argues that the District Court erred by failing to apply the "deliberate indifference test" appropriately to BMPs.  He maintains that pursuant to the United States Supreme Court's decision in *Farmer v. Brennan* (1994), 511 U.S. 825, 842, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811, the deliberate indifference test provides that "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."

¶56    *Madrid v. Gomez* (N.D. Cal. 1995), 889 F.Supp. 1146, sets forth the standard for determining deliberate indifference as it applies to improper psychological or psychiatric care in violation of the Eighth Amendment.  First, the inmate must demonstrate that "the levels of medical and mental health care are constitutionally inadequate from an objective standpoint--based on either a 'pattern of negligent conduct' or 'systematic deficiencies.'"  Second, the inmate must show that the correctional institution "knew the risk to inmate health" due to this inadequacy, and "acted with disregard for this risk."  In short, a plaintiff must show that the defendants "'consciously disregard[ed]' a substantial risk of serious harm to plaintiffs' health or safety."  *Madrid*, 899 F.Supp. at 1256 (citing *Farmer*, 511 U.S. at 840-41, 114 S.Ct. at 1980).

¶57    While at MSP, Walker was evaluated by four psychological experts.  Dr. David Schaefer, MSP staff psychiatrist, was informed as early as February 20, 1999, that Walker

complained of stomach pains associated with taking Lithium. Nevertheless, Dr. Schaefer did not evaluate Walker until March 11, 1999. That evaluation lasted less than 30 minutes. By that time, Walker had discontinued taking his Lithium because of the stomach problems he experienced. Consequently, Dr. Schaefer discontinued prescribing Lithium for Walker without reviewing Walker's medical records and without completing any psychological testing. He concluded that Walker did not have a serious mental illness, but rather an antisocial personality with narcissistic traits, typical with the things Dr. Schaefer sees at the prison on a daily basis.

¶58 On October 7, 1999, Dr. Schaefer evaluated Walker again after Walker swallowed a staple. Dr. Schaefer reported that Walker was at chronic risk for self harm, but, hopefully, he "will fall short of killing himself." Dr. Schaefer then ordered that Walker be returned to Max. Dr. Schaefer evaluated Walker once again on May 8, 2000, at the request of the prison medical director. He concluded that Walker was not Bipolar.

¶59 Dr. Andrew Schoening, a psychologist who worked at MSP along with Dr. Schaefer, also diagnosed Walker with antisocial personality disorder. He concluded that Walker fit into the category of a "self-mutilator." At the hearing on Walker's petition for postconviction relief, Dr. Schaefer explained that self-mutilators in a prison context usually injure themselves to obtain transfer to a less restrictive setting. He concluded that Walker was harming himself in an attempt to control the situation even though Walker's self harm always placed him in a more restrictive setting. Dr. Schoening also concluded that Walker's behavior, such as yelling all night long and then being assaulted by the inmate he was yelling

19

at, was not psychotic, but just poor judgment.

¶60     Dr. William Stratford, a private, board-certified psychiatrist with sub-specialties in forensic and correctional psychiatry, was asked by Walker's attorney to evaluate Walker's current diagnosis of mental health; the possibility that Walker may have suffered from fetal alcohol syndrome; and Walker's mental state at the time he committed the crimes that sent him to MSP. Dr. Stratford met with Walker on February 17 and 18, 2000, and administered several mental evaluation tests. He also reviewed all of Walker's medical records and interviewed Walker's family.

¶61     Based on his evaluation, Dr. Stratford concluded that Walker suffers from Bipolar Disorder. He also diagnosed Walker with a mixed personality disorder which severely hampers his social and occupational functioning. Dr. Stratford further concluded that while Walker was probably suffering from a mental disorder at the time he committed the crimes, there was no evidence that Walker did not have the capacity to act with purpose or knowledge.

¶62     Dr. Stratford opined that Walker had been properly treated for mental illness while in the Colorado correctional system, but that he was neglected while at MSP. In Colorado, treating physicians reported that the Lithium effectively controlled Walker's moods and behaviors. In Montana, Walker was not taking Lithium and he received more than 100 disciplinary write-ups. Dr. Stratford criticized MSP's treatment of Walker stating that it had fallen so far below the standard of care that it was negligent and scandalous. Dr. Stratford said MSP officials were too eager to label Walker as a bad person rather than seriously

20

mentally ill. According to Dr. Stratford, MSP officials didn't adequately treat Walker, but they continued to discipline him, consequently "the guy got worse and worse and worse."

¶63 Dr. Terry Kupers, is a board-certified psychiatrist specializing in correctional psychology. He has a private practice in California and he is a professor at the Wright Institute in Berkeley, California. At one time, Dr. Kupers served as a consultant to the United States Department of Justice. At the hearing on Walker's petition, the District Court recognized Dr. Kupers as an expert in psychiatry, forensic psychiatry and mental illness in a prison setting. Dr. Kupers has published numerous articles and books on the subject of mental health in prisons. In his work as an expert, Dr. Kupers has evaluated over 16 state and federal prisons in California, three prisons in Indiana, five prisons in Michigan, a Pennsylvania super-max unit, several prisons in Washington and numerous jail facilities.

¶64 In preparation for evaluating Walker, Dr. Kupers reviewed his medical and psychological records from Montana and Colorado, Dr. Stratford's evaluation, various legal documents related to the case, inmate depositions regarding Walker's behavior, and Walker's prison disciplinary record. He also personally interviewed Walker.

¶65 Dr. Kupers concluded that it was "absolutely clear" that Walker suffers from a serious mental illness, most likely Bipolar Disorder. He testified that "Mr. Walker has one of the clearest records I've seen of someone with serious mental illness." Dr. Kupers also testified that it was "inexcusable" that Walker was not on medications considering they were effective in the past. He concluded that the diagnosis from MSP's mental health staff that Walker did not have a mental illness was "preposterous" and fell below the ethical standards

21

for practicing medicine in this field.

¶66	Dr. Kupers also discussed the psychological harm caused by placing inmates in a severely restrictive setting for nearly 24 hours a day.  He stated that when placed in maximum security units, normal prisoners exhibit symptoms such as massive anxiety; acute confusion; paranoia; concentration and memory problems; and aggressive or self-destructive behaviors.  Someone prone to psychotic episodes is likely to develop these symptoms, which will then often throw that person into a psychotic breakdown.  Dr. Kupers testified that the restrictive BMPs imposed on Walker were the most counter-therapeutic, punitive and cruel plans that he had witnessed in all the states that he had reviewed.  He stated:  "If it's a security program, I think it's just cruel and inhumane.  If it's a treatment, it is ethically wrong and far below the standard in terms of all of the fields of mental health."

¶67	Dr. Kupers further explained that leaving an inmate in a bare cell, naked, and forced to sleep on a concrete slab is humiliating, degrading, and extremely painful physically.  His review of the records confirmed that segregation was absolutely not good for Walker and that if Walker had successfully killed himself after the staff psychologist returned Walker to segregation, no one would disagree that it was malpractice.  He also opined that the current prison mental health providers were biased against Walker.

¶68	MSP did nothing to treat Walker.  Rather, prison officials responded to Walker's behavior by giving Walker well in excess of 100 disciplinary write-ups and placing him in disciplinary detention or "lock down" for six months.  While in lock down, Walker was placed on a number of BMPs and with each successive BMP, Walker's behavior got

22

increasingly worse.

¶69　Walker was placed on one BMP after he made three suicide attempts on October 7, 8 and 12, 1999. Rather than rendering psychiatric or psychological treatment to Walker, prison officials placed him on a BMP and took away his mattress, pillow and all of his personal items including his clothing. This pattern continued when Walker again threatened self-harm and he was placed on another BMP on December 9, 1999. He received another BMP after threatening suicide in February 2000. Prison officials stated that BMPs are intended to manage dangerous behavior, they are not intended to be therapeutic. Walker's suicide attempts did not result in psychiatric or psychological help. Instead, they resulted in BMPs which admittedly are not therapeutic and are not a substitute for mental health assistance.

¶70　Other Max inmates reported that Walker would scream and pound on objects in his cell for hours at a time, often for entire shifts. One inmate recalled an episode where, after being deprived of his clothing and underwear, Walker yelled for two days. Walker's behavior was so aberrant that some Max inmates reported that Walker should have been placed in a psychiatric ward. However, prison officials chose to label Walker as a bad person rather than treat the mental health problems that were apparent to inmates and staff.

¶71　In *Toussaint v. McCarthy* (9th Cir. 1990), 926 F.2d 800, 801, *cert denied*, 502 U.S. 874, 112 S.Ct. 213, 116 L.Ed.2d 171 (1991), the Ninth Circuit Court of Appeals stated in regard to prisoners placed in administrative segregation:

> These consolidated appeals involve a class of prisoners, who, as a class, are the toughest for a prison to handle. They are at the bottom of the social

23

heap. They have, nonetheless, a human dignity and certain rights secured by the Constitution of the United States.

In addition, that same court stated in *Felix v. McCarthy* (9th Cir. 1991), 939 F.2d 699, 702, *cert denied by Maxie v. Felix*, 502 U.S. 1093, 112 S.Ct. 1165, 117 L.Ed.2d 412 (1992), regarding prisoner claims of excessive use of force:

> These cases demonstrate that it is not the degree of injury which makes out a violation of the eighth amendment. Rather, it is the use of official force or authority that is "intentional, unjustified, brutal and offensive to human dignity."

¶72  When the people of Montana ratified a new State Constitution in 1972, they recognized that all human beings have an innate dignity:

> **Individual dignity.** *The dignity of the human being is inviolable.* No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.

Art. II, Sec. 4, Mont. Const. (emphasis added).

¶73  In *State v. Siegal* (1997), 281 Mont. 250, 263, 934 P.2d 176, 183, *overruled in part and on other grounds by State v. Kuneff*, 1998 MT 287, 291 Mont. 474, 970 P.2d 556, we held that because Article II, Section 10 of the Montana Constitution explicitly grants to all Montana citizens the right to individual privacy, the Montana Constitution affords citizens broader protection at the hands of the government in search and seizure cases than does the federal constitution. Just as we read the privacy provision of the Montana Constitution in conjunction with the provisions regarding search and seizure to provide Montanans with greater protections from government intrusion, so too do we read the dignity provision of the

24

Montana Constitution together with Article II, Section 22 to provide Montana citizens greater protections from cruel and unusual punishment than does the federal constitution. The federal constitution does not expressly provide for the right to human dignity.

¶74 We have repeatedly recognized the rights found in Montana's Declaration of Rights as being "fundamental," meaning that these rights are significant components of liberty, any infringement of which will trigger the highest level of scrutiny, and, thus, the highest level of protection by the courts. *Dorwart v. Caraway*, 2002 MT 240, ¶ 96, 312 Mont. 1, ¶ 96, 58 P.3d 128, ¶ 96 (Nelson, J., concurring) (citing *Butte Community Union v. Lewis* (1986), 219 Mont. 426, 430, 712 P.2d 1309, 1311; *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 52, 310 Mont. 123, ¶ 52, 54 P.3d 1, ¶ 52 (Nelson, J., concurring)).

¶75 Thus, while we will analyze most cruel and unusual punishment questions implicating Article II, Section 22 of Montana's Constitution by reference to that section alone, in certain instances where Montana's constitutional right to individual dignity (Article II, Section 4) is also specially implicated, we must, of necessity, consider and address the effect of that constitutional mandate on the question before us.

¶76 Walker agrees that the prohibitions against cruel and unusual punishment do not guarantee that he will not suffer from some psychological effects from incarceration or segregation, however, "if the particular conditions of segregation being challenged are such that they inflict a serious mental illness, greatly exacerbate mental illness, or deprive inmates of their sanity, then [prison officials] have deprived inmates of a basic necessity of human existence--indeed, they have crossed into the realm of psychological torture." *Madrid*, 889

25

F.Supp. at 1264.

¶77     In addition to the problems associated with BMPs, Walker asserted that the living conditions in A-block were intolerable. Numerous inmates who resided in A-block testified about the filthy, uninhabitable cells. These inmates testified that the cells commonly had blood, feces, vomit and other types of debris in the cells they were forced to inhabit. One inmate recounted an instance where he was placed in a cell with human waste rubbed all over the walls and vomit in the corner. He claims the corrections staff ignored his complaints and told him to "live with it."

¶78     Another inmate testified that he had bloodied a cell by smashing his head against the wall. His blood remained in the cell until Walker eventually inhabited the cell. After Walker was removed from that cell sometime later, the inmate who originally bloodied the cell was moved back in. He testified that the blood streaks and the words he previously had written in blood on the wall of the cell remained unchanged.

¶79     Walker also complained that the correctional staff mishandled his food. Correctional officers passed the food through the same hatch in which toilet brushes and other cleaning supplies were passed through. While on a BMP, an inmate's food consisted of bread, lunch meat and cheese. Often this food was placed on the dirty food hatch, unwrapped. Walker also contended that on several occasions, correctional officers threw his food into the cell onto the floor where it occasionally landed under the toilet and in one instance landing in the toilet. While correctional officers testified that these incidents never occurred, other A-block inmates testified that they had either seen it happen or had heard Walker complain when it

26

happened.  One inmate described life in A-block as follows:

> My feeling of worth, you know, was just--I didn't feel worth anything, you know, I didn't want to--I didn't want to carry on.  When I finally went to the mental health block [in Max], I didn't care whether I lived or died.
> It's--eating like a dog, eating your food off the ground, and really, you know, you don't even feel human after a while . . . .

¶80    When any state, in the exercise of its police powers, receives an individual into its residential correctional systems as an inmate, it assumes responsibility for that person's general well being and for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety.  *Helling v. McKinney* (1993), 509 U.S. 25, 32, 113 S.Ct. 2475, 2480, 125 L.Ed. 2d 22.

¶81    Moreover, "[t]reatment which degrades or demeans persons, that is, treatment which deliberately reduces the value of persons, and which fails to acknowledge their worth as persons, directly violates their dignity."  Matthew O. Clifford & Thomas P. Huff, *Some Thoughts on the Meaning and Scope of the Montana Constitution's "Dignity" Clause with Possible Applications* (Summer 2000), 61 Mont.L.Rev. 301, 307 (hereafter, *Clifford*).  These authors went on to examine Montana's dignity clause in the context of mentally ill individuals and prisoners:

> [I]n the case of the mentally ill, basic human needs must be met, along with adequate opportunity to develop capacities, and adequate mental health care must also be provided to treat the illness. It is natural to speak of the inherent dignity of such developmentally disabled or mentally ill persons, and to speak of the requirement that such vulnerable persons be treated with dignity.
> For those imprisoned for crimes, complementary application of the dignity clause would be more appropriate. The reformation and prevention functions of punishment both express the community's disrespect for the actions of the criminal, but the processes of punishment must never disrespect the core humanity of the prisoner. Section 22 of Article II prohibits the

27

infliction of cruel and unusual punishment on persons.  Section 28 mandates "reformation" as one of the foundations of punishment for crimes.  Part of what these rights proscribe and mandate should be informed by the complementary application of the dignity clause. However we punish, whatever means we use to reform, we must not punish or reform in a way that degrades the humanity, the dignity, of the prisoner. Protecting dignity should include, for example, security from physical harm, including security from sexual violation, by other prisoners or guards. It should also include attention to such basic human needs as adequate medical care, humane rules for visitation, adequate exercise, and adequate opportunity for education or other capacity-developing activity. Prisoners may not claim that their punishment, itself, violates the dignity clause, unless the conditions of that punishment violate the cruel and unusual punishment prohibition, and that violation might most easily be elaborated by asking whether the core humanity of the prisoner is being treated with dignity.

*Clifford*, pp. 331-32.

¶82   Our Constitution forbids correctional practices which permit prisons in the name of behavior modification to disregard the innate dignity of human beings, especially in the context where those persons suffer from serious mental illness.  We cannot sanction correctional practices that ignore and exacerbate the plight of mentally ill inmates like Walker, especially when that inmate is forced to rely on the prison for his care and protection.  The plain meaning of the dignity clause commands that the intrinsic worth and the basic humanity of persons may not be violated.  Moreover, if the particular conditions of confinement cause serious mental illness to be greatly exacerbated or if it deprives inmates of their sanity, then prison officials have deprived inmates of the basic necessity for human existence and have crossed into the realm of psychological torture.

¶83   Walker is

part of a growing population of faceless, powerless, voiceless, warehoused people whose rights are paid lip service but rarely taken seriously by the

28

institutions responsible for their custody. The only check on that indifference is the judiciary. Sometimes the system works. Sometimes it does not. . . . When the rights of even the most disrespected among us are ignored, all of society is diminished.

*Campbell v. Mahoney*, 2001 MT 146, ¶ 57, 306 Mont. 45, ¶ 57, 29 P.3d 1034, ¶ 57 (Trieweiler, J., dissenting) (internal citations omitted).

¶84    Accordingly, we hold that, reading Article II, Sections 4 and 22 together, BMPs and the living conditions on A-block constitute an affront to the inviolable right of human dignity possessed by the inmate and that such punishment constitutes cruel and unusual punishment when it exacerbates the inmate's mental health condition.

¶85    We reverse and remand to the District Court for entry of an order requiring MSP to conform the operations of its administrative segregation units to the requirements of this Opinion and to report, in writing to that court within 180 days as to the actions taken. The District Court may, thereafter, order inspections or further remediation as in that court's discretion is necessary under the circumstances.

/S/ JAMES C. NELSON

We Concur:

/S/ JIM REGNIER
/S/ PATRICIA COTTER
/S/ TERRY N. TRIEWEILER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

Chief Justice Karla M. Gray, dissenting.

¶86    I respectfully dissent from the Court's opinion, as I dissented from an order in an earlier phase of the underlying matter.  It is my view that this case is now moot and that many of  the  procedural approaches by the Court in this cause and in Cause No. 00-034 have been totally lacking in legal authority.  The result is that this Court has improperly intruded into issues involving conditions at the Montana State Prison (MSP) and reversed the District Court without determining that any of its extensive findings of fact are clearly erroneous or that its conclusions of law are incorrect.  The Court also has placed that same District Court Judge in the position of undertaking further inspections and remediation regarding conditions of confinement at the MSP.  I cannot agree.

¶87    Paragraphs 30 and 31 of the Court's opinion do not fully capture the facts and procedural background regarding Walker's petition to this Court in January of 2000, in Cause No. 00-034, and in subsequent matters.  We deemed the January of 2000 document a petition for writ of mandamus and remanded to the Third Judicial District Court, Powell County, for the appointment of counsel to investigate the factual basis for Walker's complaint and, if warranted, to file a petition for appropriate relief in that court.  The Third Judicial District Court expressed concern over the funding for the ordered counsel and investigation, and we subsequently ordered and received a response from the Department of Corrections (DOC).  Among other things, the DOC argued that a writ of mandate was not appropriate because the petition did not meet the statutory requirements for such a writ.  Having initially deemed

30

Walker's petition as one for a writ of mandamus, this Court thereafter simply ignored--and never addressed--the mandamus requirements.

¶88    Instead, the Court concluded that if Walker's allegations were true, his constitutional rights to be free from cruel and unusual punishment *might* be implicated, but conceded that it was not authorized to collect the information and resolve the factual issues which might arise from the investigation. The Court then stated that persons imprisoned in Montana are not without "a remedy when or if their civil rights are violated." I agree wholeheartedly with both of those statements in the Court's order of March 9, 2000. Indeed, both this Court and Montana inmates are aware that the remedy for alleged violations of civil rights is 42 U.S.C. § 1983. With full knowledge of § 1983 actions to protect civil rights, however, the Court did not state that to be the available remedy. It chose to conclude that our earlier decision in *Ranta v. State*, 1998 MT 95, 288 Mont. 391, 958 P.2d 670, provided the "way out" it was so desperately seeking for Walker to be able to proceed. The Court erred in this regard, and I dissented.

¶89    *Ranta*, ¶ 29, held that when an inmate seeks review of his or her sentence by this Court's Sentence Review Division, that process is "a critical stage" of criminal proceedings for which a person is entitled to appointment of counsel where the possibility exists that a sentence will be increased. I agree entirely with the holding in *Ranta*. That holding, however, has absolutely no bearing on--or relevance to--inmate challenges to conditions of confinement once incarcerated, under the right to be free from cruel and unusual punishment, where § 1983 actions are the proper remedy. Such challenges, under either the law or

31

common sense, simply are not seeking "review of a criminal sentence" in any form or fashion. Notwithstanding, the Court concluded, without any applicable legal authority whatsoever, that Walker's challenge to the conditions of his confinement "is a critical stage *related to* the penalty phase of the criminal proceedings against him" (emphasis added) and, consequently, Walker was entitled to appointment of counsel. The potential consequences of that conclusion--essentially, that appointed counsel is required whenever an inmate challenges conditions of confinement--cannot be calculated. Suffice it to say that costs for appointed counsel, now a state funded cost, will skyrocket and, almost without doubt, both district court case loads and this Court's case load will do the same.

¶90     With regard to Walker's January of 2000 petition, then, the final portion of this Court's order remanded to the Eighth Judicial District Court, Cascade County, in which Walker had been convicted and sentenced, for appointment of counsel to investigate the conditions of Walker's imprisonment and, if warranted, to petition that court for the appropriate relief. As mentioned above, I dissented from that order.

¶91     On remand, counsel was appointed for Walker and began an investigation into Walker's allegations. He eventually petitioned for postconviction relief on Walker's behalf in the District Court. After receiving testimony and evidence regarding the petition on several occasions, the District Court entered its extensive Findings of Fact, Conclusions of Law and Order on February 14, 2001, denying all relief requested by Walker. Walker then appealed to this Court in this Cause Number and the Court now issues its opinion, from which I dissent on a myriad of grounds.

32

¶92 First, I disagree with the Court's conclusion in Issue 1 that Walker's appeal is not moot even though he has been released from custody. Given his release, this Court cannot grant any effective relief to him. The inability to grant effective relief is, as the Court observes, our usual mootness test.

¶93 Moreover, I do not agree that either *K.G.F.* or *N.B.* is sufficiently similar to the present case as so to make those cases applicable here under the "capable of repetition, yet evading review" exception to the mootness test. In *N.B.*, the mootness issue arose in the context of what quantum of proof is required to involuntarily commit a person to a state mental hospital. The appellant argued that a Montana statute was unconstitutional pursuant to a United States Supreme Court opinion. We disagreed, held the statute constitutional and then, applying the statute to the appellant's proceeding, concluded that the statutory requirements for involuntary commitment had not been met. That case did, indeed, involve a broad constitutional issue that was applied *to* the appellant's case and, through it, to future cases. The reason it was necessary to do so under the exception to the mootness test was that a 90-day commitment made the timely resolution of an appeal from a commitment order "virtually impossible given our rules of appellate procedure." *N.B.*, 190 Mont. at 322-23, 620 P.2d at 1231. *K.G.F.* also involved a 90-day involuntary commitment to a state mental hospital and we addressed the broad constitutional issue of whether the right to effective assistance of counsel applies in involuntary commitment proceedings, an issue not previously addressed by this Court.

¶94 The present case is readily distinguishable from *both K.G.F.* and *N.B.* Those cases

33

involved precommitment issues on which our holdings had universal application to all involuntary commitment proceedings. They had nothing to do with conditions of confinement during an individual's commitment and, therefore, were not limited to case-specific facts. Here, the Court states the "broad constitutional issue" on which it premises its determination that the case is not moot as whether BMPs constitute cruel and unusual punishment when such plans exacerbate an inmate's mental health condition. This is not a determination that can readily be applied to a broad spectrum of cases. I recognize that the Court is attempting in good faith to analogize the *very* short-term BMPs in the present case to the 90-day commitments in *K.G.F.* and *N.B.*, in an effort to ensure that, somehow, BMPs will not be used when they exacerbate an inmate's mental health condition--so as to address in advance these situations which cannot be timely reviewed on appeal. The fact remains, however, that the crux of each case will be the issue of whether use of a BMP exacerbates the inmate's condition. Thus, while the Court's opinion may force the DOC to scrutinize using BMPs more carefully in certain cases, perhaps a laudable achievement, it cannot and will not preclude more cases incapable of timely review. Indeed, Walker's petition was on his own behalf and the District Court ruled accordingly; the Court does not apply or address the actual facts of this case which, I note, do not include findings or conclusions that the BMPs "exacerbated" Walker's mental health condition.

¶95     On appeal, Walker then stated the issue more broadly and, perhaps not surprisingly, the Court accepted this "invitation" to intrude into prison management to an extent I believe is untenable and insupportable. The Court did not stop there, however. It *sua sponte*

34

broadened the issue even further (without so stating in the issue itself) in ¶ 84 by holding that both BMPs "and the living conditions on A-block" violate constitutional rights. In my view, Walker having sought relief from certain conditions he experienced while in the MSP, no effective relief can be granted by this Court now that he has been released, notwithstanding the Court's holding in ¶ 45 that it is Walker's appeal the Court is addressing. I submit that, in essence, the Court is issuing an advisory opinion, which courts have no jurisdiction to do. *See Northfield Ins.Co. v. Montana Ass'n of Counties*, 2000 MT 256, ¶ 18, 301 Mont. 472, ¶ 18, 10 P.3d 813, ¶ 18 (citations omitted). Absent a showing in this case that either the BMPs or the conditions on A-block have exacerbated any inmate's mental health condition, this case simply does not meet the "capable of repetition, yet evading review" test necessary to avoid mootness.

¶96     Mootness aside, the Court totally disregards the District Court's 56 findings of fact, covering 18 pages, and its conclusions of law. While stating the proper standard of review regarding the clearly erroneous test for findings of fact and the "correct" standard for conclusions of law, the Court never addresses a single one of the District Court's 56 findings, much less determines that any of them are clearly erroneous. Indeed, many of the so-called facts presented throughout the Court's opinion are at odds with those found by the District Court. Nor does the Court address any errors it has discovered in the District Court's conclusions of law which, of course, are premised on that court's findings of facts. Finally, with regard to the Court's reliance on the Montana constitutional right to individual dignity, Walker did not raise "dignity" or "humanity" in the District Court until filing his Proposed

35

Findings of Fact and Conclusions of Law and even there, he did not cite to Article II, Section 4 of the Montana Constitution. For that reason, I disagree with the Court's reliance on that particular constitutional right in its opinion.

¶97  More importantly, the Court's vague and conclusory statements about this constitutional right do little to provide guidance in defining that right. Nor does the Court present the ordinary analysis of whether any violations of the right to dignity which might occur in prison settings can withstand our usual constitutional scrutiny. And while "some thoughts on the meaning and scope of the Montana Constitution's dignity clause" by noted academics are of interest, they do not provide the needed analytical structure for addressing that right as it relates to the surely undisputed need of correctional officials to run prisons confining many violent and manipulative inmates.

¶98  The Court concludes broadly that "[o]ur Constitution forbids correctional practices which permit prisons in the name of behavior modification to disregard the innate dignity of human beings." Such a conclusion fails to take into account or balance other constitutional rights which may be at issue in an appropriate case, such as those inalienable rights guaranteed by Article II, Section 3, held by other inmates, correctional staff and the Montana public. Virtually every aspect of being incarcerated may, to some extent, degrade and demean persons. Certainly any member of this Court would find it so. But no legal authority is presented, and I daresay none can be found, which even begins to support the breadth of the Court's conclusion. It is not enough to say that no other state has a comparable constitutional right and then just "take the ball and run with it."

36

¶99 In this latter regard, the Court does not look to the source of the dignity right found in Article II, Section 4 of the Montana Constitution--namely, the verbatim transcript of the Montana Constitutional Convention. That transcript for March 7, 1972, where the Convention delegates unanimously adopted Section 4, captures the clear intent of the Convention with regard to the dignity right contained in Section 4--an intent totally at odds with the Court's discussion of the right in this case:

> DELEGATE MANSFIELD: The committee unanimously adopted *this section* with the intent of providing a constitutional impetus for the eradication of public and private discrimination based on race, color, sex, culture, social origin or condition, or political or religious ideas. The provision, quite similar to that of the Puerto Rico declaration of rights, is aimed at prohibiting private as well as public discrimination in civil and political rights. Considerable testimony was heard concerning the need to include sex in any equal protection or freedom from discrimination provisions. The committee felt that such inclusion was eminently proper and saw no reason for the state to wait for the adoption of the federal equal rights amendment or any amendment which would not explicitly provide as much protection as this provision. The word "culture" was incorporated specifically to cover groups whose cultural base is distinct from mainstream Montana, especially the American Indians. Social origin or condition was included to cover discriminations based on status of income and standard of living. Some fears were expressed that the wording "political or religious ideas" would permit persons who supported the right to work in principle to avoid union membership. Such is not the intent of the committee. The wording was incorporated to prohibit public and private concerns discriminating against persons because of their political or religious beliefs. The wording of this section was derived almost verbatim from the Delegate Proposal Number 61. The committee felt that this proposal incorporated all features of all the delegate proposals, numbers 10, 32, 50 and 51, on the subjects of equal protection of the laws and the freedom from discrimination. The committee is well aware that any broad proposal on these subjects will require considerable statutory embellishment. It is hoped that the Legislature will enact statutes to promote effective eradication of the discriminations prohibited in this section. The considerable support for and the lack of opposition to this provision indicates its import and advisability. . . .

37

. . . .

> DELEGATE DAHOOD: . . . *There is no intent within this particular section to do anything other than* to remove the apparent type of discrimination that all of us object to with respect to employment, to rental practices, to actual associationship in matters that are public or matters that tend to be somewhat quasi-public. . . . . *The intent of Section 4 is simply to provide that every individual in the State of Montana, as a citizen of this state, may pursue his inalienable rights without having any shadows cast upon his dignity through unwarranted discrimination.* . . .

Montana Constitutional Convention, Verbatim Transcript, Vol. V, March 7, 1972, pp. 1642-43 (emphasis added). It is my view that Delegates Mansfield and Dahood presented Section 4 as a package intended in its entirety to prohibit intrusion on a persons's dignity through discrimination, and the Convention accepted it as presented. Nothing in the transcripts supports a free-standing, separate dignity right.

¶100   As its last "act" in the present case, the Court puts the District Court in charge of such "inspections or further remediation as in that court's discretion is necessary under the circumstances." I suspect that, like myself, the District Court will have no idea what to do, when to do it, or how to respond to what may well be hundreds of petitions addressed to it requesting inspections into, investigations of, or challenges to conditions of confinement at any of Montana's correctional facilities. Nor, I expect, will that court have a clue how it is to fund such matters.

¶101   I dissent strenuously from the Court's opinion. I would affirm the District Court.

/S/ KARLA M. GRAY

38